```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE


SANOFI-AVENTIS U.S. LLC,   )
et al,                     )
                           )
             Plaintiffs,   )
                           ) C.A. No. 14-113-RGA
v.                         )
                           )
ELI LILLY and COMPANY,     )
                           )
             Defendant.    )


                      Monday, April 14, 2014
                      3:04 p.m.


                      844 King Street
                      Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge


APPEARANCES:


         ASHBY & GEDDES
         BY:  STEVEN J. BALICK, ESQ.

                  -and-

         GIBSON DUNN & CRUTCHER, LLP
         BY:  JOSEPH EVAIL, ESQ.
         BY:  TRACEY DAVIES, ESQ.
         BY:  MARK A. PERRY, ESQ.

                  -and-

         SANOFI
         BY:  NICHOLAS A. POULOS, ESQ.

                      Counsel for the Plaintiffs
```

```
 1    APPEARANCES CONTINUED:

 2

 3            FARNAN, LLP
              BY:  BRIAN FARNAN, ESQ.
 4
                      -and-
 5
              PAUL HASTINGS
 6            BY:  BRUCE WEXLER, ESQ.
              BY:  NICHOLAS TYMOCZKO, ESQ.
 7            BY:  DAVID M. CONCA, ESQ.

 8
                      -and-
 9
              ELI LILLY AND COMPANY
10            BY:  PAUL R. CANTRELL, ESQ

11                    Counsel for the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE COURT:  Good afternoon,
 2      everyone.  Please be seated.
 3                    A lot of people for a two-party Rule
 4      16 conference.  So this is Sanofi-Aventis U.S.,
 5      et al versus Eli Lilly & Company.  Civil Action
 6      Number 14-113.
 7                    And Mr. Balick, --
 8                    MR. BALICK:  Yes, Your Honor.
 9                    THE COURT:  -- who's with you here?
10                    MR. BALICK:  From the Gibson Dunn &
11      Crutcher firm, closest to Your Honor, Joseph
12      Evail and Tracey Davies.  And next to me is Mark
13      Perry, all from Gibson Dunn.
14                    And Nic Poulos from Sanofi.
15                    THE COURT:  All right.  Good
16      afternoon to you all.
17                    Mr. Farnan.
18                    MR. FARNAN:  Yes, Your Honor.
19                    Brian Farnan on behalf of the
20      defendant.  With me, Bruce Wexler from Paul
21      Hastings.  Paul Cantrell from Eli Lilly.
22                    David Conca from Paul Hastings and
23      Nic Tymoczko from Paul Hastings.
24                    THE COURT:  All right.  Well, good
```

```
1     afternoon to you all, too.

2               All right.  So I see there's this

3     motion to dismiss by the plaintiff of two of the

4     defendants' counterclaims.  I see the briefing is

5     not quite final.

6               When's the final brief supposed to

7     be?

8               MR. BALICK:  Today, Your Honor.

9               MR. EVAIL:  Today.

10              THE COURT:  So I suppose I'm going

11    to get it in an hour or two?

12              MR. EVAIL:  Sometime after the

13    conference, yes.

14              THE COURT:  Do you want me to tell

15    you how it comes out?

16              MR. EVAIL:  Do you want me to tell

17    you or --

18              THE COURT:  Well, you can tell me

19    how it comes out.

20              MR. EVAIL:  We're certainly hoping

21    that the motion will be granted.

22              THE COURT:  All right.  What's your

23    second choice?

24              MR. EVAIL:  The second choice would
```

 1   be that it would not be granted.

 2                THE COURT:  Okay.  Well, I think

 3   we're going to go with the second choice.

 4                You know, as far as the

 5   counterclaims on invalidity go, it looks like

 6   every other invalidity counterclaim I've ever

 7   seen.  And I think it will get narrowed down

 8   through contentions.

 9                And as far as the patent misuse

10   goes, I looked at it.  It seems to me to touch on

11   all the elements.

12                I think there is a factual basis for

13   the things that it is reasonable to have a

14   factual basis for, the things I do think there's,

15   if I read the case law right, as saying it can be

16   an anti-competitive effect or purpose.

17                I think the allegation is certainly

18   that there's a purpose.  The effect may take

19   longer to take place.

20                So I'll see if the brief that I get

21   in a couple hours changes my mind, but otherwise,

22   I'll just enter an order denying the motion.

23                All right.  So I also looked through

24   the Rule 16.  I saw there was a lot of agreement

```
 1    here.
 2                  What I thought I would do is tell
 3    you what I had in mind for a trial and you can
 4    tell me -- well, so trial, the defendants propose
 5    August 31st of 2015.  That didn't work so good
 6    for me.
 7                  The plaintiffs proposed
 8    December 14th, 2015.  But is there a reason why?
 9                  So the exact date of August 31st
10    doesn't work, but why do plaintiffs propose a
11    slower schedule?
12                  MR. EVAIL:  Well, Your Honor, there
13    are really two respects that are built into the
14    schedule.  One of them is with respect to the
15    timing between the Markman hearing and the timing
16    that we will be submitting expert reports.  We
17    wanted to make sure that there was sufficient
18    time built into the schedule so that we could
19    have a ruling on the claim construction.
20                  The experts would have a chance to
21    analyze the ruling and incorporate it into their
22    opinions, and we thought it would be much more
23    efficient for everyone concerned if they were
24    able to do that before submitting expert reports.
```

1            So we actually allowed a period of

2     approximately four months between the date of the

3     hearing and the time that expert reports were due

4     to allow Your Honor a chance to rule on the claim

5     construction issues and to allow the experts a

6     chance to incorporate -- to consider the ruling

7     and analyze the rule incorporated into their

8     opinions.

9            The other reason that our schedule

10    puts dates out a little bit, and I just think

11    it's worth noting, that this is a Hatch-Waxman

12    case with two very large companies over very,

13    very significant product.  And we have proposed

14    what we consider to be an aggressive schedule

15    where about 24 months to the date of trial from

16    the date that we receive notice, rather than 30,

17    twenty-two and a half months out from the date

18    that we started the litigation.

19            One of the main things besides the

20    spacing between the time of the Markman ruling

21    and the time of the submission of the expert

22    reports is how much time to allow for fact

23    discovery.  And the reason this case is a little

24    more complicated than others, besides the fact

1   that all the knowledge about the product and the

2   information about the product and so forth is

3   within defendants' sole possession at this point,

4   is that there are a number of very significant

5   witnesses and documents that are outside of this

6   country and/or nonparties specifically.

7          And we're doing everything we can to

8   expedite things as much as we will be able to do

9   with respect to witnesses.  But we have the one

10   set of inventors on the formulation patents that

11   work was done by Sanofi in Germany.

12          One of the inventors is still an

13   employee and, obviously, we will bring that

14   employee to the United States.  Another is no

15   longer an employee.

16          With respect to the other set of

17   patents which concern the device for

18   administering the product, those devices were

19   invented by a company in the U.K. called DCA.

20   It's a small company and it is an independent

21   company.  We contracted with them to develop the

22   devices.

23          There are three inventors there.

24   The patents were prosecuted and they have been

1    assigned to our client.  But although we are

2    represented, we're arranging to represent DCA in

3    the litigation.

4              Again, it's a small company.  One of

5    the inventors is no longer employed by DCA.

6              We're going to do everything we can,

7    but the fact that all of these documents and

8    inventors are either in Europe or not under our

9    possession, custody or control necessarily means

10   it's going to be a little bit harder to be as

11   quick as we might otherwise want.

12             In addition, there is an entity on

13   the other side of the V line, which is Boehringer

14   Ingelheim.  Boehringer Ingelheim, and I'll spell

15   that later, worked with Lilly to develop their

16   proposed follow-on product.

17             And, in fact, in December when they

18   announced that the filing had been accepted by

19   FDA or the follow-on product had been accepted,

20   it was a joint announcement between Lilly and

21   Boehringer Ingelheim.

22             Boehringer Ingelheim is not a party

23   to this case.  They are in Germany.

24             At this point, we have no knowledge

```
 1   at all about how much important information, how

 2   many important documents and how many critical

 3   witnesses are actually employed by Boehringer

 4   Ingelheim, and what efforts we will need to go

 5   through and what kind of ability Lilly may have.

 6                Lilly's counsel may have to expedite

 7   that in order to get us the discovery that we

 8   might need of that party.  So really with respect

 9   to the schedule, there are two main things that

10   cause us to be about approximately three months.

11                THE COURT:  Three months, yes.

12                MR. EVAIL:  Three months later and

13   that is the two extra months that we built in

14   between the Markman hearing and the start of

15   expert reports and the extra time that we think

16   is needed for fact discovery.

17                THE COURT:  All right.

18                MR. WEXLER:  Thank you.  So for the

19   three-month delta, and the reason that, just so

20   Your Honor understands that through the process,

21   we gave them original dates which were much

22   earlier.  These are the dates that they proposed.

23                THE COURT:  This is the product of

24   negotiation?
```

```
 1                    MR. WEXLER:  Well, what I'm trying
 2       to say:  Our dates are right in the middle of
 3       where we started out.  We're at the three-month
 4       delta and that three-month delta, there's an
 5       inherent problem which is their date lands right
 6       at Christmas.
 7                    So what that means is that if
 8       there's any slippage in the schedule over the
 9       course of the schedule, what we're going to do is
10       we're going to probably end up being in the year
11       after between post-trial briefing and scheduling
12       a trial and this and that.
13                    So, at the outset, our date by being
14       before, not right up until Christmas, is that
15       there is a small cushion if there needs to be a
16       small bump.  Putting that aside, with respect to
17       the different points that he raised, so the claim
18       construction, we have an earlier disclosure of
19       claim terms that conforms to Your Honor's order.
20       We have the claim terms and the proposed
21       constructions in Your Honor's form order.  That
22       tends to disincentivize overburdening the words,
23       a lot of terms that don't need construction.
24                    So we have a procedure in our
```

 1    proposal where you go forward with the claim

 2    terms and the construction, and then we follow on

 3    with the claim construction process.  And we have

 4    a two-month window before expert discovery

 5    starts.

 6                 Now, we would just simply -- if Your

 7    Honor doesn't rule within those two months on

 8    whatever terms there are, then we'll proceed on

 9    alternative theories on the different terms.

10    There's no guarantee that even if we set it at

11    four months that we'll not only have a ruling,

12    we'll have enough time to do all the things that

13    we would do any way.

14                 So if we get a ruling, we proceed

15    with it.  If we don't, we do alternative

16    theories.

17                 So we don't see a reason to hold off

18    significantly on that.  So that takes care of the

19    two-month delta.

20                 Then in terms of the other points

21    that were raised about Boehringer and the company

22    abroad, a couple important points.  First of all,

23    the patent is on formulation, the ingredients in

24    the formulation and the patent.  Sanofi -- I

 1    mean, Lilly is the formulation of the patent.

 2    Boehringer is not involved in that.

 3              So, on April 18th, we've agreed to

 4    produce this Friday, the core technical

 5    documents, the entire drug product section of the

 6    NDA that describes the identity of the device, of

 7    what the mechanism of operation is, which, by the

 8    way, is the same as the product that's been on

 9    the market for years already.  So they already

10    have all the information about the device.

11              Secondly, on the formulation, we've

12    already given an identification, a list of

13    ingredients, and we'll do that again.  We'll give

14    the drug product section.

15              So on April 18th they will have the

16    list of ingredients that are in our formulation.

17    So we can then start down the process of

18    hopefully whittling this down and finding out

19    what the contentions are under our schedule.

20              It doesn't, in our view -- and I

21    understand Your Honor's schedule, our date

22    doesn't work.  And surely --

23              THE COURT:  I was just saying August

24    31st.  I'm not saying a date close by won't work.

```
 1                    MR. WEXLER:  We don't see any reason

 2      to -- three months, it's not that giant a delta,

 3      but to put it right up to Christmas doesn't make

 4      a whole lot of sense.

 5                    THE COURT:  In that regard, you

 6      know, I've got a lot of cases.  Somebody has to

 7      be right next to Christmas.

 8                    MR. WEXLER:  Your Honor, if we're

 9      setting up a schedule, why burden the Court and

10      put post-trial briefing over the year-end

11      holidays.  And if, God forbid, an expert needs an

12      extra week and we need to bump out the schedule a

13      couple weeks, now we're potentially in the new

14      year in 2016.

15                    THE COURT:  All right.  So here's

16      what I'm thinking:  The dates that would work for

17      me, and I think, as it turns out, it doesn't

18      quite split the difference, but I was thinking of

19      trial on September 28th, 2015.  That, I believe,

20      is a Monday.

21                    And so normally I would schedule

22      trial to start at 8:30 a.m., rather than 9:30

23      a.m.  I know there are a lot of patents, but

24      nevertheless, you should be thinking that it will
```

1  end up being a three-day bench trial, not five,

2  and that you'll get ten and a half hours each.

3          We then have the pretrial conference

4  ten days before this on September 18th, 2015 at

5  8:30 a.m.  In terms of the scheduling, I can do

6  the claim construction a little bit sooner than

7  what you had proposed.

8          Let's see.  What is that date?

9          The parties propose early in 2015.

10  I think you can stay on the briefing schedule

11  that you're on, but I could do it on

12  December 19th of 2014 at 9:30 a.m.

13          And so what I was thinking is for

14  the rest of the dates, I'm sort of thinking that

15  you could probably work them out between

16  yourselves, working around those dates.

17          I think there was one other date

18  where I actually had a suggestion here.  The date

19  to join other parties is Paragraph 2.  I was

20  inclined to go with the defendants' proposal of

21  November 14th, 2014.

22          So, in terms of just a schedule, can

23  you work out the rest of these things between the

24  two of you?

1                    MR. WEXLER:  Sure.

2                    MR. EVAIL:  Sure.

3                    THE COURT:  All right.  Well, then

4       there's some other issues.

5                    And the core technical documents, I

6       read these two descriptions of things.  Does

7       Lilly actually have these samples that the

8       plaintiff wants you to produce?

9                    MR. WEXLER:  Your Honor, I'm not

10      sure that we could produce them on Friday.  But

11      as I mentioned, the pen's already on the market,

12      so they have access to unlimited quantities of

13      the pen design.

14                   The design --

15                   THE COURT:  Well, I don't think

16      they're actually asking for multiple copies of

17      the pen.

18                   MR. WEXLER:  I thought they were

19      asking for 20 samples of the pen.

20                   THE COURT:  Oh, in a prefilled

21      insulin -- okay.  All right.

22                   You're right.  Sorry.  All I saw was

23      the word insulin.

24                   MR. WEXLER:  Your Honor, just so

```
1    Your Honor understands, this is an example of the

2    pen.

3                     THE COURT:  I know how these pens

4    work.

5                     MR. WEXLER:  But the pen that Lilly

6    makes, Kwik Pen has been on the market for many,

7    many years.  And we've already told them that the

8    new product is in a pen that is the same design

9    and operation as this pen that's been around

10   forever.

11                    So they have that.

12                    THE COURT:  Well, in any event,

13   leaving that aside and maybe you can't do it by

14   this Friday, but well, I guess, this Friday is

15   April 18th.  That's the significance.

16                    But, and sometimes they don't like

17   to go to the pharmacy and buy the pens.  They'd

18   rather get them from you.

19                    In terms of what the plaintiff

20   wants, is there anything that you object to?

21                    MR. WEXLER:  I think we would work

22   out whatever we need to work out, first of all.

23   But our objection is that on Friday, this Friday,

24   we can give them, as I said, the section of the
```

```
 1   NDA on the drug product.

 2              In terms of samples --

 3              THE COURT:  So actually that's the

 4   first thing because they say a full and complete

 5   copy of NDA Number 205-692, including any

 6   amendments or supplements thereto.  That sounds

 7   rather broader than what you're saying you're

 8   going to give them on Friday or is it?

 9              MR. WEXLER:  This is an NDA.  This

10   is not an ANDA case.  This is a new drug

11   application.

12              There's 41,000 pages of clinical

13   trial that Lilly did with personal privacy

14   issues, HIPAA issues.  That is their genetic

15   engineering of the protein.

16              Lilly is one of the top companies in

17   the world that does genetic engineering.  That is

18   a trade secret of Lilly and it has no bearing on

19   the formulation patent or the pen.

20              So, if I may, so the idea that we

21   would have to turn over the entire NDA and then

22   go through a process, for example, for redacting

23   out all the clinical trial and personal

24   information, and then also hand over trade secret
```

1   information on the genetic recombinant

2   technology, that is not what these patents are

3   about.  It's very, very serious.

4              And so on the core technical

5   documents, we took a very broad section to the

6   drug product section.  That's the section that

7   describes the formulation as opposed to this.

8              There's two components, the active

9   ingredient, which, in this place, is a protein,

10  Insulin Glargine.  It's not a small molecule.

11  It's not like a chemical through an oddity.

12             This is covered by Hatch-Waxman the

13  normal way, but it's actually a protein.  And

14  it's very sophisticated genetic engineering that

15  goes into making the protein.  And Lilly can do

16  that, and they guard that as a trade secret.

17             So that's why we object to, as a

18  core technical document, to turning over the

19  entire NDA, not to mention that we couldn't do

20  that on April 18th any way.

21             THE COURT:  Well, leave aside the

22  date.  What do you have to say about that?

23             MR. EVAIL:  Just on a couple of

24  points, Your Honor.  First of all, we are willing

```
 1    to agree to have the personal information

 2    redacted out.

 3                 We all know there are complicated

 4    HIPAA issues and it's very burdensome.  The

 5    personal data can be redacted out.

 6                 But with respect to the parts that

 7    we need, for example, to the chemical and

 8    manufacturing information, because in the end the

 9    question that we ask with respect to --

10                 THE COURT:  Well, you know, there

11    could be a certain amount of talking across of

12    cross purposes here.  He said, I think, he didn't

13    want to give you the trial data, the trial data

14    which includes a lot more than just personal

15    information; right?

16                 MR. WEXLER:  Right.  There's a

17    section called drug product.  I believe that has

18    all the information about the product, the

19    ingredients, Lilly's analysis of the formulation.

20    It's a very significant production.

21                 MR. EVAIL:  We also need the

22    chemical and manufacturing section because, in

23    the end, the question with respect to our

24    formulation patents is not what their list of
```

```
 1    ingredients is, but it's:  What is in the product

 2    that is going to be sold?  What's actually in the

 3    vial?

 4              We need to be able to see the

 5    analyses that are done, and we need to be able to

 6    do our own analyses to see if there's something

 7    in it, whether introduced through the engineered

 8    protein or from something else, that either is

 9    the special ingredient in our formulation patents

10    or acts equivalently to what the formulation

11    patents do, which is to prevent an agglomeration

12    of the Insulin Glargine protein.

13              There was a problem with some of the

14    products early on that there was a cloudiness

15    that was observed because there was an

16    agglomeration of the molecules.  The Insulin

17    Gargline molecules bound together.

18              And we have a patent on a way of

19    preventing that from happening, and we need to

20    see what's actually in the vial that's sold

21    through chemical analysis through the

22    manufacturing process to understand whether

23    they're doing that.

24              THE COURT:  Well, I'm not sure I'm
```

1    hearing him object to you getting chemical

2    analysis of the product that's actually sold.  Am

3    I hearing that?

4                    MR. WEXLER:  Well, we're giving the

5    drug product section of an ANDA that has an

6    analysis by Lilly of the formulation.  And by the

7    way, we're not dealing with vials.  We're dealing

8    with pens.

9                    There's a significant difference and

10   that is that they only added that ingredient to

11   the vial.  The pens that they sell today don't

12   have that ingredient, and we've given a list of

13   ingredients that don't include that ingredient.

14                   So one of the fundamental things

15   that we need to understand, and it sounds like

16   we're sort of getting there, is that based on

17   what we're saying we put in this product, in

18   other words, what we represent to the FDA we add

19   as the ingredient, is there a claim of

20   infringement?

21                   Because if there isn't, and it's

22   some theory that something is forming somewhere,

23   we certainly would like to know that.  But they

24   can certainly tell us right off the bat when they

```
 1    look at a file that says what we put in there, is

 2    there a claim of infringement based on that?  And

 3    I don't really have an answer to that.

 4              THE COURT:  All right.  So you all

 5    know better than me because I have no idea at all

 6    what's in an NDA as opposed to an ANDA.

 7              Right now you've got certain

 8    portions that you're saying, yeah, you'll give

 9    them on Friday.  I have the impression, though I

10    can't a hundred percent tell, that they're saying

11    you need some things beyond what they're going to

12    give on Friday.

13              And I guess what I'd say is it's

14    hard for me to tell, in the abstract -- maybe

15    abstract is not the right word.  You know, I

16    heard two things from Mr. Evail.

17              No, you're Mr. Evail.

18              Mr. Wexler.

19              MR. WEXLER:  Mr. Wexler.

20              THE COURT:  Okay.  That you don't

21    want to give over something about the genetic

22    engineering, and honestly, from what I could

23    understand it doesn't sound like he was asking

24    for the genetic engineering, and that you didn't
```

```
 1    want to give over the data from trials.  And it

 2    didn't sound to me like he was asking for that.

 3              So recognizing there's 41,000 pages,

 4    or, you know, more or less, and you say you're

 5    giving over one section, which is what again?

 6              MR. WEXLER:  He, by virtue, asked

 7    for the whole NDA.  But, in any event, we have a

 8    drug product section that's a term of art in this

 9    area.  It covers the entire drug product.

10              THE COURT:  All right.  And so you

11    give that over by Friday.

12              The second thing that you were

13    mentioning, Mr. Evail, was something about

14    chemical?

15              MR. EVAIL:  The CMC section.

16              THE COURT:  And CMC stands for what?

17              MR. EVAIL:  Chemical manufacturing

18    and engineering and control.  Sorry, controls.

19    Sorry.

20              THE COURT:  Harder when the initials

21    don't even match.

22              And the chemical manufacturing and

23    engineering or --

24              MR. EVAIL:  Controls, I'm sorry.
```

1          THE COURT:  Controls, whatever, do

2     you know what he's talking about, Mr. Wexler?

3          MR. WEXLER:  To some extent, I would

4     if it was an ANDA.  But a NDA, it's actually a

5     new drug application.

6          My clients tell me the CMC section

7     includes parts about this genetic engineering and

8     the protein.  So it's not as clean as it would be

9     in an ANDA.

10         The drug product section is really

11    the clean section that tells them everything

12    about what Lilly puts in that formulation.  And

13    so, Your Honor, I would suggest, I think, we're

14    going to probably have a lot of fights throughout

15    the course of the case, with all due respect to

16    my colleagues.  But what I would suggest, at

17    least on Friday, if we give him the drug product

18    section and they see the ingredient that we're

19    listing to the FDA that gets added, they could at

20    least articulate to us:  Is that a claim of

21    infringement or is there something more?

22         THE COURT:  I don't think you're

23    going to be so lucky on that, so why don't you

24    give them what you can give them on Friday, what

```
 1    you've promised.  I understand that the CMC

 2    section, which they want, might have some of the

 3    genetic engineering that you want to give over

 4    your dead body.

 5              Am I right?

 6              MR. WEXLER:  Yeah.

 7              MR. EVAIL:  I think on both counts,

 8    yes.

 9              THE COURT:  All right.  So I'm not

10    going to decide that based on here and now.

11              What I'm going to do is I'm going to

12    refer discovery dispute in this to the Magistrate

13    Judge since you've now promised that you'll be

14    able to keep her busy for a while.  And so, and

15    it seems to me working through this might be

16    difficult.

17              So, in terms of the Scheduling

18    Order, why don't you just put in that we'll

19    produce the part that Mr. Wexler has said that he

20    will produce.  And the parties will try to

21    arrange -- I'm not going to necessarily adopt

22    Mr. Wexler's formulation, but -- or that's a bad

23    word here, but the way he said it.

24              But it seems to me as though what
```

 1    I'm hearing is Mr. Evail says, Yeah, we don't

 2    need the whole NDA.  Mr. Wexler doesn't want to

 3    give the whole NDA.

 4              But what Mr. Evail says, he may

 5    include part of what Mr. Wexler doesn't want to

 6    give.  And so, Mr. Wexler, give over on Friday

 7    the part that you've identified and you can go

 8    from there between yourselves as to how much more

 9    you need and how much more you're willing to

10    give.  And if you can't resolve it, you can come

11    back to the Court.

12              In terms of the samples of the

13    prefilled insulin delivery devices, do I take it,

14    is there any problem with producing those?  I

15    understand that it may not be on Friday, but

16    sometime in the fairly near future.

17              MR. WEXLER:  Yeah.  I don't know

18    about Friday, but going forward.

19              THE COURT:  Okay.  And so, you know,

20    I'm not sure at this point what "all other core

21    technical documents" mean.  Are there any other

22    core technical documents besides what's in the

23    NDA?

24              MR. WEXLER:  Not to our knowledge.

```
 1                    MR. EVAIL:  Schematics and drawings
 2      of the patent, which often aren't in the NDA,
 3      sort of the technical drawings.
 4                    MR. WEXLER:  And that was in our
 5      offer --
 6                    THE COURT:  All right.  So then
 7      produce them.
 8                    Does that give you sufficient
 9      resolve as to where we stand on that for you to
10      write something down and put it in the order?
11                    MR. EVAIL:  I think so.  It would be
12      very helpful for us to have the Table of Contents
13      to their NDA.
14                    THE COURT:  It seems like a
15      reasonable request.
16                    MR. WEXLER:  Again, I don't know if
17      it gives away parts.  I'll check.
18                    THE COURT:  Seems to me hard --
19      Table of Contents mostly just teases your
20      interest.  They usually don't satisfy it.
21                    MR. WEXLER:  I'll check.  It's an
22      NDA not an ANDA.  If it was an ANDA, it would be
23      a lot easier.
24                    THE COURT:  Okay.  Why don't you
```

1    check on that.

2                 MR. WEXLER:  I will check on that.

3                 THE COURT:  Then you have various

4    dates that you're going to work out in terms of

5    the deposition discovery.

6                 MS. DAVIES:  Your Honor, may I ask a

7    question with respect to the production of the

8    samples?  I'm just thinking through my mind the

9    things that will need to be done once we receive

10   that.

11                And the schedule that we have, is

12   there any way that we could have a date certain?

13   I know you may not be able to answer that.

14                Is there any way we could pick a

15   date somehow on production of the samples?

16                MR. WEXLER:  I'm sure we can tell

17   you this week probably a date when we can get it

18   to you.  I just don't have a date certain now.

19                MS. DAVIES:  As I'm sure you can

20   imagine, we want those for testing purposes.

21                THE COURT:  Limitation on hours of

22   deposition discovery.  Plaintiffs say 70 hours.

23   Defendants say a hundred hours.

24                It's not 30(b)6.  Oh, it does

```
1    include 30(b)6.

2              So basically that's all depositions

3    other than experts?

4              MR. EVAIL:  Correct.

5              THE COURT:  And is there some

6    principal reason as to why I should pick one or

7    the other number?

8              MR. WEXLER:  If you want to start.

9              MR. EVAIL:  I was just going to say

10   the rules provide for 70.  The rule contemplates

11   that it include third parties, non-parties and

12   30(b)6 witnesses.  And we saw no reason to depart

13   from the rules.

14             MR. WEXLER:  Your Honor, as we know,

15   there's at least five inventors we've asked for

16   in two days, with the inventors up to two days,

17   which is pretty standard.  So that's already --

18   we're already at 70.

19             THE COURT:  Even though it may be

20   pretty standard, but I'm sure Mr. Farnan will

21   tell you it's not standard with me.

22             MR. WEXLER:  Okay.  So, in any

23   event, we have the inventors and then additional

24   witnesses.  A hundred hours is enough, we think,
```

```
 1    but I don't know that 70 would be enough.

 2              THE COURT:  Well, okay.  You know

 3    what, I was going to go with 70, but what I think

 4    is:  It is a big case and there are some

 5    witnesses you're going to have to do.

 6              So I'll give you a hundred hours.

 7    Presumably both sides will be guided by sort of

 8    the same.  You know, if one side seems to be

 9    unnecessarily deposing, then it has a way of kind

10    of settling out.

11              So a hundred hours.  In terms of the

12    interpreter, and I believe, I can't remember --

13              MR. EVAIL:  Your Honor, we're

14    actually in agreement.  We just put it in

15    separate paragraphs because of the other material

16    that was there.

17              THE COURT:  So, okay.  So the only

18    other thing is the interpreters or the inventors

19    are seven hours.  Okay.

20              I mean, if you turn out to need

21    more, that's fine.  But I can't actually believe

22    you will.

23              All right.  Defendants propose the

24    plaintiffs will produce the inventor of the
```

```
 1    asserted patents in the United States for their
 2    depositions.  I assume, inventors who are not
 3    actually in the employ of the plaintiff, I don't
 4    know, I guess if you end up representing the
 5    small British company, that's an interesting
 6    question.
 7              What's your position on that?
 8              MS. DAVIES:  Your Honor, at this
 9    point, we don't have consent from them to agree
10    to produce those witnesses in the United States.
11    Two of the three device inventors are still with
12    that small company.
13              And while I can't commit to it right
14    now, I can tell you we will make an effort to
15    produce them in the United States.  And we
16    certainly will produce all the Sanofi employees
17    in the United States.
18              The third inventor is no longer with
19    DCA design.  He's working for --
20              THE COURT:  Well, --
21              MS. DAVIES: -- a separate entity.
22              THE COURT: -- I guess in terms of
23    the burden on the companies to litigate, in the
24    end, if you have to go to Great Britain, or
```

```
 1    France, or Germany or someplace to do a

 2    deposition because the inventor doesn't want to

 3    come here, it's going to kind of work out equally

 4    for both of you; right?

 5              MS. DAVIES:  I think that's fair.

 6    We'll certainly make every effort to bring them

 7    there.  It's just we're not in a position --

 8              THE COURT:  No.  No, I understand.

 9              I'd much rather have you not promise

10    things you can't deliver than the opposite.

11              Mr. Wexler.

12              MR. WEXLER:  So two things, Your

13    Honor.  First of all, the inventors each have

14    executed and signed documents agreeing to testify

15    in legal proceedings.  And --

16              THE COURT:  Do they also agree to

17    testify in the United States in legal

18    proceedings?

19              MR. WEXLER:  To testify in any legal

20    proceeding and to execute all applications or

21    papers to obtain --

22              THE REPORTER:  Could you please slow

23    down?

24              MR. WEXLER:  Sorry.  I forgot we
```

1   have a reporter here.

2            To testify in any legal proceeding

3   and to execute all applications or papers

4   necessary to obtain and maintain proper patent

5   protection on said inventions in the United

6   States.  And this Court, in several decisions,

7   has ordered such witnesses to come to the United

8   States.

9            Now, in terms of actual location,

10  just traveling, that isn't really the key issue.

11  The key issue is if we have to start using the

12  Hague, it's going to drag everything out and

13  that's going to delay everything.  And

14  potentially the schedule falls apart.

15           So, you know, I'm happy --

16           THE COURT:  Well, just what you read

17  to me, I didn't actually hear promising that for

18  depositions, they would show up in the United

19  States.  I didn't actually hear that.

20           I heard in the United States filling

21  out all the paperwork, so I'm not inclined to

22  order anyone to appear in the United States

23  without -- and what I'll do is I'll accept

24  Ms. Davis.

```
 1              MS. DAVIES:  Davies.

 2              THE COURT:  Davies, sorry.

 3   Ms. Davies' representation here that they'd try

 4   to produce them in the United States, and that

 5   the ones who are in their employ, they will

 6   produce in the United States, which seems to me

 7   about 80 percent of what you're asking for here.

 8              MR. WEXLER:  Your Honor, I just

 9   realized that the assignment for the device guys

10   is different.  It has even more provisions about

11   them coming to the United States.

12              THE COURT:  All right.  Well, I

13   presume that if Ms. Davies agrees with you,

14   that's what they say, they'll get them here.  But

15   I'm not going to even -- you can delete that from

16   the order that you submit.

17              MR. WEXLER:  Your Honor, one last

18   thing.  I'm sorry.

19              Could we at least have an answer

20   relatively quickly whether they're going to take

21   the position we need the Hague?  Because if we

22   need the Hague, we've got to get started on that.

23              THE COURT:  No.  No.

24              I think that's a reasonable thing.
```

1    Ms. Davies, when do you think you'll be in a

2    position to provide that information?

3              MS. DAVIES:  I can tell you we are

4    working rapidly to try to provide that.  We have

5    a call set with them where we're going to try to

6    resolve this next week.  I can't guarantee we'll

7    have resolution next week.  We're moving things

8    very rapidly forward.

9              THE COURT:  So why don't we just say

10   two weeks from today, you'll tell them whether or

11   not the Hague Convention needs to be used for

12   anybody.  That's, obviously, someone that

13   someone's going to want to depose.

14             And so I'd say:  Does that seem

15   reasonable?

16             MS. DAVIES:  Yes.  Can we shoot for

17   May 2nd?  That's a Friday.

18             MR. WEXLER:  Your Honor, they

19   represented to us that they represent these

20   inventors.  They've told us, Don't contact them

21   because we represent them.

22             And the question is --

23             THE COURT:  Well, I thought I

24   actually heard her say that they were in the

```
1    process of obtaining the representation.

2              MS. DAVIES:  We do represent some of

3    them and --

4              THE COURT:  Okay.

5              MS. DAVIES:  -- we're in the process

6    of finalizing the engagement.  I have no doubt

7    that there will be a relationship there, so I'm

8    not uncomfortable with that representation.

9              What I'm not entirely comfortable

10   with is they are still trying to determine how

11   they're going to manage this litigation.  We have

12   every incentive not to go through the Hague and

13   to produce these witnesses in the United States.

14   I don't know how I can say it anymore clear.

15             And we're happy to commit to get

16   that information to you as quickly as we can.  We

17   have an interest in getting it quickly, too.

18             MR. WEXLER:  Sure.  Certainly.

19             I guess we just need to know because

20   we may also, in parallel, move to enforce the

21   contract so that we don't have to -- we can do

22   the Hague at the same time, try to get them here.

23             I'm really concerned that this Hague

24   thing eradicates the schedule in a bad way.  And
```

```
 1    so to wait -- you know, December 18th, we gave

 2    them notice that we were challenging these

 3    patents.

 4                    THE COURT:  Well, you know, I'm here

 5    right now.  Ms. Davies has said she'll get you an

 6    answer by May 2nd.

 7                    You know, if you want to spend some

 8    time drafting up Hague papers in the meantime, go

 9    ahead, but I think she'll get you an answer.  And

10    I take her at her word that she'd like them to be

11    deposed here, too.

12                    Okay.

13                    MR. BALICK:  Your Honor, on that

14    point, if it turns out on a fact

15    witness-by-witness instance, there's certain

16    assignment documents and certain facts, we bring

17    that to your attention, in light of if there's a

18    certain inventor they say, We're not bringing,

19    but the overwhelming facts support they should be

20    brought here --

21                    THE COURT:  If you have a discovery

22    dispute, you can bring it up.

23                    MS. DAVIES:  I can put on the

24    record, this is one inventor who's no longer a
```

1    member of DCA.  We absolutely represent him.  We

2    have that engagement letter in place.

3             He's asking if we can do the

4    deposition in the U.K. on the weekend, so it

5    doesn't disrupt his existing job.  We've got some

6    challenges there.

7             MR. WEXLER:  But we wouldn't need

8    the Hague for that.

9             MS. DAVIES:  Again, I would hope

10    not.

11             MR. EVAIL:  Your Honor, there's a

12    reciprocal concern on our point with respect to

13    Boehringer Ingelheim.  We're not entirely certain

14    about what the nature of the relationship is

15    between Lilly's counsel and Boehringer Ingelheim.

16             And we are most certainly going to

17    need discovery of them in Germany.  It would be

18    very helpful to us if, by the same date that

19    we're going to be providing them information

20    about the possible need for Hague with respect to

21    the inventors, if they could provide us with the

22    reciprocal information regarding Boehringer

23    Ingelheim.

24             MR. WEXLER:  I'll tell you right

```
 1    now:  We don't represent Boehringer Ingelheim.

 2    It's its own company, and they weren't involved,

 3    as to my knowledge.

 4              I know you're saying you're going to

 5    take all the discovery, but I think when you get

 6    the documents from us, you'll see that they

 7    didn't create the formulation.  And the pen has

 8    been on the market for many, many years, so they

 9    obviously weren't involved in the patent.

10              I know you're saying Boehringer, but

11    we don't represent them.  So...

12              MR. EVAIL:  We just don't have that

13    information yet and we want to make sure.

14              THE COURT:  Well, now you have the

15    information.  They don't represent them.

16              MS. DAVIES:  Well, actually that's

17    in contrast with what Mr. Conca represented to us

18    on the phone.  He said you did not represent

19    Boehringer Ingelheim with respect to this

20    particular issue, but that you did represent

21    Boehringer on other issues.

22              And while you don't have information

23    from Boehringer about their involvement, you do

24    have information from Eli Lilly about
```

1   Boehringer's involvement.

2               MR. WEXLER:  Okay.  I hoped there

3   was no confusion.  Boehringer Ingelheim is a

4   client of my firm.  We are not representing

5   Boehringer Ingelheim in connection with this

6   matter.

7               That is first.  And I think what

8   Dave said was perfectly clear on that.

9               The second thing is that I think

10  that takes care of what you're saying.  There's

11  no conflict in terms of what Dave said.

12              I'm not sure what else I could tell

13  you.

14              MS. DAVIES:  It seems there's been

15  some conflicting statements about, to the extent

16  Boehringer may have information or Lilly might

17  have information, but I'm sorry that came out in

18  the context.

19              THE COURT:  I was going to say I

20  don't think we're going to figure that out right

21  now.  You can talk to each other about that.

22              Was there anything else other than

23  scheduling here that -- I think everything else

24  is scheduling.

```
 1                    Wait a second.  Oh, yeah.

 2                    Okay.  So Number 11, application by

 3      motion.  The defendant seems to want to file some

 4      written motions.

 5                    Actually what is the dispute here?

 6                    MR. WEXLER:  The plaintiff wants a

 7      ruling right now that there will never be a

 8      summary judgment motion in the case, and our view

 9      is we're not asking for summary judgment, but

10      we're sort of leaving it open that if we were to

11      ask for leave --

12                    THE COURT:  Well, you can always ask

13      for leave, --

14                    MR. WEXLER:  So we just opposed

15      their ruling saying, no, right now --

16                    THE COURT:  -- but you should

17      understand that leave probably won't be granted.

18      And if it is granted, the motion will probably be

19      denied any way.

20                    MR. WEXLER:  Understood.

21                    THE COURT:  Right, Mr. Farnan?

22      Isn't that what I do?

23                    MR. FARNAN:  Yes, Your Honor.

24                    THE COURT:  But there's always a
```

1    first time.

2                    MR. WEXLER:  Thank you.

3                    THE COURT:  All right.  So I think,

4    as I said, in the paragraph about the ADR,

5    whoever is doing this, if you can put in ADR

6    process and discovery, and then put the matter is

7    referred to a Magistrate Judge for managing

8    discovery and to explore the possibility of

9    alternative dispute resolution.

10                   I take it you do want to have a

11   Magistrate Judge assigned for alternative dispute

12   resolution.  It doesn't sound like you're --

13                   MS. DAVIES:  I don't have an

14   objection.

15                   MR. WEXLER:  Whatever Your Honor

16   prefers.  We haven't discussed it.

17                   THE COURT:  All right.  Well, in any

18   event, if it turns out that, you know, the

19   judges, as counsel, Delaware counsel will tell

20   you, I mean, they don't impose themselves where

21   there's no point.

22                   So, and they'll work with you if you

23   think there is a point.  And so I don't think

24   that will be a burden.

```
 1                  All right.  So --
 2                  MR. WEXLER:  Your Honor, one other
 3      quick thing --
 4                  THE COURT:  Yeah.
 5                  MR. WEXLER:  -- that's somewhat
 6      important.  So on the 18th we're going to produce
 7      documents.
 8                  Right now, we don't have a
 9      Protective Order and there's some fundamental
10      disagreements on some important components of
11      that.
12                  THE COURT:  Well, right now it's
13      outside counsel only.  The details of what inside
14      counsel, things like that, can be worked out.
15                  MR. WEXLER:  The problem that we've
16      been going back and forth on is outside the
17      follow-on Sanofi product, outside counsel, we've
18      been talking about having some sort of bar that
19      protects the people seeing the highly
20      confidential information from advising Sanofi
21      about other products, for example.
22                  But what we don't have -- without a
23      Protective Order in place, we don't have anything
24      on that and we are talking about something.
```

1          THE COURT:  Well, eventually you can

2    try to work out the Protective Order.  If not,

3    the Magistrate Judge will resolve the matter for

4    you.

5          I don't know.  I'm not going to just

6    resolve it based on a little bit of back and

7    forth chatter here.

8          MR. WEXLER:  No.  My proposal was

9    going to be if we have the 18th as the date to

10   submit our competing proposals, which is our

11   suggestion, we can make a production under our

12   more restrictive proposal.

13         And then if it turns out that it's

14   less restrictive, it's fine to drop down the

15   restriction.  It doesn't require any additional

16   work.

17         But the problem right now is that

18   once the cat's out of the bag, it's too late.

19         MR. EVAIL:  Your Honor, the

20   restrictions, we're prepared and, of course,

21   happy to abide by Delaware Local Rule 26.2 until

22   a Protective Order is entered.  But the terms

23   that they are proposing would put a stain on

24   anyone from outside counsel that actually looks

```
 1     at any of the documents that are produced in the

 2     litigation or produced pursuant to this exchange

 3     of such a serious nature, that half of our team

 4     has not looked at the opposition papers filed

 5     with respect to the motion until this issue is

 6     worked out.

 7                    And it's really unworkable for us to

 8     take a risk of being subjected to the terms that

 9     they are proposing, which we consider so onerous

10     and unacceptable.

11                    MR. WEXLER:  It's the old --

12                    THE COURT:  Wait.  Wait.

13                    What are the terms, as you

14     understand them?

15                    MR. EVAIL:  It's a bar on advising

16     with respect to FDA work and a bar with respect

17     to advising on patent prosecution work.

18                    THE COURT:  The FDA bar, I'm sure,

19     will be denied down the road, but I can't

20     guarantee you.

21                    What was the other thing?

22                    MR. EVAIL:  With respect to advising

23     with respect to patent prosecution, and it's a

24     very broad --
```

```
 1              THE COURT:  And so it's this include

 2    not only, you know, generally patent prosecution

 3    that's generally granted.  The question is just

 4    reexamination and things like that?

 5              MR. EVAIL:  It's broader than that,

 6    to the extent it touches on development arguments

 7    with regard to prior art and so forth.  It's --

 8    we just consider it --

 9              THE COURT:  Well, so what do you

10    want me to do about it?  Because I am actually

11    not going to rule on words here.

12              They had their view.  You are

13    probably -- it sounds like you're not going to

14    agree to a Protective Order.

15              You're going to submit some

16    competing things.  It will be resolved.

17              What is it you want me to do?

18              MR. EVAIL:  Well, we are prepared to

19    abide by local Rule 26.2, which would mean that

20    only outside counsel can have access to this

21    material.  But we don't want to risk looking at

22    this material and then finding that our ability

23    to advise and work with our client down the road

24    is impaired.
```

1          MR. WEXLER:  Your Honor, very

2     briefly, the terms that we're talking about are

3     already the ones the parties agreed to pre-filing

4     when we turned over our information and offer of

5     confidential access.

6               Now, I recognize they said we're not

7     going to agree to that necessarily for

8     litigation, but what we're proposing is basically

9     the same thing.

10              Secondly, outside counsel, my

11    proposal is simply we abide by the OCA for now.

12    And if a less restrictive provision comes in,

13    then it's downgraded.

14              There's no harm.  There's no

15    limitation.  But the reverse is impossible.

16              Under the outside counsel

17    provisions, for example, Sanofi right now has a

18    product called U300 to -- it's a follow-on

19    product.  And they proposed a draft that would

20    allow outside counsel seeing Lilly's most highly

21    confidential marketing and pricing information to

22    advise Sanofi about the U300 product.

23              And we saw that and we said, How

24    could you do that?  And they said, Well, we

```
 1    should.
 2                   Now, I'm not asking for resolution
 3    of dispute, but what I'm saying is if we abide by
 4    a pure outside counsel without any restriction,
 5    we're going to confront this problem.  So I
 6    suggested that we take the OCA terms, we make our
 7    initial production on the OCA terms.
 8                   You can sign an undertaking for
 9    anybody that needs to see it.  I'm surprised that
10    people haven't looked at it.
11                   And if there's a downgrade, it just
12    goes into the downgrade.  There's no harm.
13                   We can get the Protective Order done
14    by your date, if we need to.  And then by May 1
15    or whatever, you'll know what the answer is.
16                   But the reverse is impossible.
17                   MR. EVAIL:  Your Honor, when we
18    negotiated the OCA, we were anxious to get some
19    information so that we could form a judgment
20    about commencing suit.  The terms were onerous.
21                   We specifically put into Paragraph 1
22    a statement that says that we agree that the
23    terms of the OCA are entered into without
24    prejudice to each party's right to seek to
```

1    include additional or different terms in a

2    Protective Order in the event of litigation.

3            MR. WEXLER:  We don't dispute your

4    right to do that.

5            MR. EVAIL:  But to be bound by these

6    onerous terms in litigation really creates a

7    tremendous burden on us.

8            THE COURT:  All right.  So I'm not

9    sure that I can do anything because I'm not a

10   party to this OCA, even though I think, I guess I

11   understand.

12           The issue is your concern that if

13   you just get this material, only outside counsel

14   gets it.  You want to make sure the eventual

15   Protective Order, in case it's not exactly the

16   one you had in mind, is --

17           MS. DAVIES:  Do you mind if I add

18   something?  So one thing, the OCA only covers the

19   information they provided to us pursuant to the

20   negotiated OCA, which was 66 pages of documents.

21   We're fine with that.

22           The problem is now in the context of

23   litigation, if they're making brief filings and

24   exhibits in support of their filings in the

```
 1    litigation, and we're subject to these sweeping

 2    prosecution bars, it inhibits, it impacts even

 3    our right to advise the client with respect to

 4    this litigation because of the breadth of the

 5    bar.

 6                There are any number of issues that

 7    are potentially considered patent prosecution

 8    issues that range from just administerial things,

 9    advising the client on, you know, you should do

10    this with respect to some, again, very

11    administerial issues, some assignment issue or

12    something like that in the Patent Office that now

13    perhaps there's an argument that, because someone

14    looked at information they submitted in the

15    litigation, that they want to bootstrap the OCA

16    in to cover.  We can't advise on that.

17                So it puts Gibson Dunn in a

18    situation where we're not able to advise the

19    client or anyone that would be representing

20    Sanofi.  So all we're asking is that for contact

21    for the purpose of litigation, that any documents

22    they submit be treated like any other litigation

23    in this Court and subject to the local rule until

24    a Protective Order gets in place.  At which point
```

1   we'll all be subject to the Protective Order.

2                As they said, they're going to be

3   arguing for prosecution bar on --

4                THE COURT:  Well, so what is wrong

5   with that?  Because I think that's what I had in

6   mind.

7                MR. WEXLER:  I'll give you an

8   example, because, as we speak, they have these

9   pending applications on these patents.  There's a

10  thicket that we've talked about and our

11  prosecution bar was aimed at preventing outside

12  counsel from getting all the confidential

13  information, from working on the prosecution of

14  pending applications.

15               Now, my solution, first of all, I'm

16  not suggesting you don't have a right to dispute

17  it.  And I'm not suggesting that you're bound by

18  it.

19               My solution was very straight

20  forward.  On April 18th, we submit our competing

21  proposals.  And that in our proposal we're

22  telling you is going to be what's the OCA.

23               We make our production subject to

24  that, and then we fight it out.  And if you want

```
 1    a broader one or we negotiate or we lose a

 2    broader one, all that means is it gets

 3    downgraded.

 4              THE COURT:  So, but I don't

 5    understand.  What I hear them saying and what I

 6    hear you saying is essentially that whatever the

 7    final Protective Order is, that's what's going to

 8    control; right?

 9              MR. WEXLER:  Right.

10              MS. DAVIES:  Right.

11              MR. EVAIL:  Yes.  This is --

12              MR. WEXLER:  This is an interim fix

13    because once the cat's out of the bag, we can't

14    get back there.

15              THE COURT:  So how many days are we

16    expecting this interim fix to be covering?

17              MR. WEXLER:  We said for April 18th.

18    For competing proposals, May 1.

19              MS. DAVIES:  It's going to be a

20    negotiated issue.

21              THE COURT:  Right.  Right.

22              I understand it's going to take some

23    time.

24              MR. WEXLER:  May 1.  Pick their
```

1    date, May 1.

2              MS. DAVIES:  The problem is the

3    prosecution bar that's in the OCA.

4              THE COURT:  Well, you know, here's

5    the thing.  The basic thing is, of course,

6    counsel are not going to actually disclose

7    anything that they get in from you.

8              And the whole prosecution,

9    patent-prosecution-bar-type stuff is generally

10   designed to prevent inadvertent disclosure, and

11   it kind of makes sense.  You are talking a long

12   period of time.

13             You start to gain a lot of

14   knowledge.  And I think for the short period of

15   time that we're talking about and, you know,

16   maybe it's a month, I think I can count on the

17   good judgment of counsel, not only not to,

18   obviously, break the rules, but to be very

19   careful that they don't do anything that counts

20   as inadvertent disclosure.

21             So --

22             MS. DAVIES:  Thanks, Your Honor.

23             MR. EVAIL:  Yes.

24             MR. WEXLER:  Just a hypothetical:

1    Last week they issued -- they listed a patent in

2    the Orange Book and wrote us a letter saying,

3    "This patent just issued.  What are you going to

4    do about this patent?  Are you certifying it?"

5              Obviously, they want to bring it

6    into the case.  I don't see how they can see our

7    confidential information and advise Sanofi at all

8    about these pending patents, the prosecution of

9    these pending patents.

10             And like I said, one just issued --

11   got listed last week.

12             THE COURT:  All right.  I hear what

13   you're saying, but I'm not going to put anything

14   special.  And hopefully I will encourage both

15   sides to work on the negotiations to actually get

16   a final Protective Order that then you'll both

17   know exactly what the rules are.

18             MR. WEXLER:  Okay.

19             THE COURT:  Thank you.

20             MR. WEXLER:  Should we have a date,

21   May 1, to get --

22             THE COURT:  Why don't you negotiate

23   dates without me.  All right.

24             Is there anything else in terms of

```
 1    what's in the Rule 16 Scheduling Order that

 2    either I've missed or that you want to talk

 3    about?

 4                    For what it's worth, or -- never

 5    mind.  I'll let you all work that out.

 6                    Is there anything else that you want

 7    to talk about?

 8                    MR. WEXLER:  No.  Thank you, Your

 9    Honor.

10                    MR. EVAIL:  Nothing from here, Your

11    Honor.

12                    MS. DAVIES:  Thank you.

13                    THE COURT:  All right.  So if you

14    want to stay here a little while and work out

15    these intermediate dates, that's fine.  As long

16    as you're right here sitting, no time like the

17    present to work out the rest of the schedule.

18                    MR. WEXLER:  It's a religious

19    holiday, Your Honor.  I'm happy to try, but --

20                    THE COURT:  No.

21                    MR. WEXLER: -- I have an earlier

22    train.

23                    MR. EVAIL:  Maybe we'll be on the

24    same train.
```

```
 1                    MS. DAVIES:  Negotiate on the train.

 2                    THE COURT:  I'm sorry.  Where are

 3      you from, Washington or New York?

 4                    MR. EVAIL:  New York.

 5                    MR. WEXLER:  New York.

 6                    MS. DAVIES:  Texas.

 7                    THE COURT:  But, in any event, I do

 8      appreciate, now that you mention it, that there's

 9      a religious holiday.  You may need to get

10      somewhere in a hurry.

11                    So, but try to get it worked out

12      quickly.

13                    MR. WEXLER:  We will, Your Honor.

14                    THE COURT:  Thank you.  And

15      Mr. Farnan, who's going to submit this?

16                    Mr. Balick?

17                    MR. BALICK:  I guess I will be.

18      Thank you, Your Honor.

19                    THE COURT:  I'm looking for this by

20      the end of the week, another religious holiday.

21      Okay.

22                    MR. BALICK:  Thank you, Your Honor.

23                    (Conference was concluded at 3:58 p.m.)

24
```

1   State of Delaware)
                     )
2   New Castle County)

3
                    CERTIFICATE OF REPORTER
4

5            I, Heather M. Triozzi, Certified
    Professional Reporter, Registered Professional
6   Reporter and Notary Public in the State of
    Delaware, do hereby certify that the foregoing
7   record, Pages 1 to 58 inclusive, is a true and
    accurate transcription of the above-captioned
8   proceedings, held on the 14th day of April, 2014,
    in Wilmington.
9            IN WITNESS WHEREOF, this 14th day of
    April, 2014, at Wilmington.
10

11                   /s/ Heather M. Triozzi, CSR, RPR
                     Heather M. Triozzi, CSR, RPR
12                   Cert. No:  184-PS
                     Exp:  Permanent
13

14

15

16   DATED:  April 17, 2014