IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SANOFI-AVENTIS U.S. LLC, SANOFI-AVENTIS DEUTSCHLAND GMBH, | ) ) ) | |
| | ) | C.A. No. 14-113-RGA-MPT |
| *Plaintiffs*, | ) | |
| | ) | ████████████████████ |
| v. | ) | ████████████████████ |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| *Defendant*. | ) | |

**PRETRIAL ORDER EXHIBIT 2:**

**SANOFI'S STATEMENT OF FACTS**

# TABLE OF CONTENTS

Page

I.   DISPUTED FACTS CONCERNING THE ASSERTED DEVICE PATENTS ...................... 1

 A.  The Device Patents-In-Suit ................................................................................ 1

   a.  The '044 and '069 Patents ....................................................................... 1

   b.  The '864 Patent ....................................................................................... 2

   c.  Development of the Asserted Device Patents ........................................... 3

 B.  New Drug Applications ("NDAS") .................................................................. 4

   a.  Sanofi's NDA ......................................................................................... 4

   b.  Lilly's NDA and BIV 60 KwikPen ......................................................... 4

 C.  Sanofi's SoloSTAR® Device Practice All Elements of the Asserted Claims .................... 6

 D.  Infringement of the Asserted Device Patents ('044, '069, and '864 Patents) .................... 7

   ■ ██████████████ Meets the Disputed Claim Limitations of the '044 Patent ........ 7

   ■ ██████████████ Meets the Disputed Claim Limitations of the '069 Patent ....... 20

   ■ ██████████████ Meets the Disputed Claim Limitations of the '864 Patent ....... 20

 E.  Validity of the Asserted Device Patents ('044, '069, and '864 Patents) ........................ 26

   a.  Obviousness ........................................................................................... 27

 F.  Prosecution of the Device Patents ................................................................... 35

   a.  '225 Application Family ......................................................................... 36

   b.  '866 Application Family ......................................................................... 36

   c.  Prioritized Examination ......................................................................... 37

II.  DISPUTED FACTS CONCERNING THE ASSERTED FORMULATION PATENTS ...... 37

 A.  The Formulation Patents-In-Suit ..................................................................... 37

   a.  The Asserted Formulation Patents ('652 and '930 Patents) ..................... 38

 B.  New Drug Applications ("NDAS") ................................................................ 38

   a.  Sanofi's NDA ......................................................................................... 38

   b.  Lilly's NDA ........................................................................................... 40

C.  Sanofi's Reformulated Lantus® Product Practices All Elements of the Asserted Claims 43

D.  Infringement of the Asserted Formulation Patents ('652 and '930 Patents) .................... 43

    **a.**  We believe Lilly will concede that Lilly's Proposed Insulin Glargine Product Meets Certain Claim Limitations of the '652 and '930 Patents....................................43

E.  Validity of the Asserted Formulation Patents ('652 and '930 Patents) .......................... 57

    **a.**  Written Description.....................................................................................................57

Pursuant to Local Rule 16.3(c)(4), Plaintiffs Sanofi-Aventis U.S. LLC ("Sanofi U.S.") and Sanofi-Aventis Deutschland GmbH ("Sanofi GmbH") (collectively, "Plaintiffs" or "Sanofi")[1] submit the following issues of fact that remain to be litigated.  Sanofi's identification of the issues of fact that remain to be litigated is based upon its current understanding of the arguments Defendant Eli Lilly and Company ("Eli Lilly") is likely to make, based on the pleadings, discovery, and expert reports in the action to date.  To the extent that Lilly introduces different or additional facts or alleged facts to meet its burden of proof, Sanofi reserves its right to contest such facts or alleged facts, and to present any and all rebuttal evidence in response.

## I.   DISPUTED FACTS CONCERNING THE ASSERTED DEVICE PATENTS

### A.   The Device Patents-In-Suit

1.     U.S. Patent No.8,603,044 ("the '044 Patent"), U.S. Patent No. 8,679,069 ("the '069 Patent"), and U.S. Patent No. 8,556,864 ("the'864 Patent") are referred to herein as the "Asserted Device Patents."  By assignment, Sanofi GmbH owns all right, title, and interest to each of the Asserted Device Patents-in-Suit.

2.     Sanofi U.S. is the exclusive licensee of the Asserted Device Patents-in-Suit with exclusive rights, including the rights to sell and offer to sell in the United States the technologies, products, or services claimed by the Patents-in-Suit, further including the right to sue and recover for the infringement of the Patents-in-Suit.

#### a.   The '044 and '069 Patents

3.     United States Patent 8,679,069 ("the '069 Patent") is titled "Pen-Type Injector."

4.     United States Patent No. 8,603,044 ("the '044 Patent") is titled "Pen-Type Injector."

---

[1]   Plaintiffs refer to Sanofi throughout to refer to the current corporate entities Sanofi-Aventis U.S. LLC and Sanofi-Aventis Deutschland GmbH, as well as their predecessors-in-interest.

5.      The '069 Patent received a Patent Term Adjustment of 406 days under 35 U.S.C. § 154(b).

6.      On June 4, 2013, U.S Patent Application No. 13/909,649 (which issued as the '044 Patent) was filed as a continuation of U.S. Patent Application No. 12/944,544 (which issued as the '069 Patent).

7.      On November 11, 2010, U.S. Application No. 12/944,544 (which issued as the '069 Patent) was filed as a continuation of U.S. Patent Application No. 11/483,546, filed July 11, 2006. U.S. Patent Application No. 11/483,546 issued as U.S. Patent No. 7,918,833 on April 5, 2011.

8.      On July 11, 2006, U.S. Patent Application No. 11/483,546 was filed as a continuation of U.S. Patent Application No. 10/790,225.

9.      On March 2, 2004 U.S. Patent Application No. 10/790,225 was filed and claimed priority to Great Britain Patent Application No. 0304822.0.

10.     On March 3, 2003, GB Patent Application No. 0304822.0 was filed.

**b.      The '864 Patent**

11.     U.S. Patent No. 8,556,864 ("the '864 Patent") is titled "Drive Mechanisms Suitable for Use in Drug Delivery Devices."

12.     The '864 Patent received a Patent Term Adjustment of 301 days under 35 U.S.C. § 154(b).

13.     On March 30, 2011, U.S. Patent Application No. 13/075,212 (which issued as the '864 Patent) was filed as a continuation of U.S. Patent Application No. 11/520,598.

14.     On September 14, 2009, U.S. Patent Application No. 11/520,598 was filed as a continuation of U.S. Patent Application No. 10/790,866.

15.     On March 3, 2004, U.S. Patent Application No. 10/790,866 was filed, claiming priority to GB 0304822.0.

16.     On March 3, 2003, Great Britain Patent Application No. 0304822.0 was filed.

**c.     Development of the Asserted Device Patents**

17.     The inventions described and claimed in the Asserted Device Patents were developed at DCA Design International, Ltd. ("DCA"), in Warwick, England.

18.     In 2001,



19.

20.     Between late 2001 and December 2002,

21.

22.  ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

23.  ████████████████████████████████████████████

███████

24.     On March 3, 2003, DCA filed Great Britain Patent Application No. 0304822.0,
which is the priority application for the Asserted Device Patents.

**B.     New Drug Applications ("NDAS")**

**a.     Sanofi's NDA**

25.     At various times, Sanofi U.S. listed the '864, '044, and '069 Patents in the FDA's
Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") as
covering its Lantus® SoloSTAR® products.

**b.     Lilly's NDA ███████████████████**

26.     On or around December 18, 2013, Lilly submitted NDA No. 205-692 to the FDA
under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. §
355(b)(2), seeking the FDA's approval to manufacture commercially and sell its proposed
product—an insulin glargine [rDNA origin] for injection, 100 units/mL ("Lilly's Proposed
Insulin Glargine Product"), in a prefilled insulin delivery device ████████████████████
█████████████ prefilled insulin delivery device that contains Lilly's Proposed Insulin Glargine
Product.  Lilly's Proposed Insulin Glargine Product and ██████████████████ collectively
referred to as the "Proposed Product."

27.  ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



28.

7.

29.

30.

31.



**C.    Sanofi's SoloSTAR® Device Practice All Elements of the Asserted Claims**

32.     The dosing mechanisms of Sanofi's Lantus® SoloSTAR® and Sanofi's Apidra® SoloSTAR® (collectively "SoloSTAR®") are identical.

33.     Sanofi currently markets and sells SoloSTAR® devices in the United States.

34.     We believe that Lilly will concede that the SoloSTAR® practices claim 2 of the '864 Patent.

35.     SoloSTAR® practices claims 1, 5, 7, and 10 of the '044 Patent.

36.     SoloSTAR® practices claim 1 of the '069 Patent.

37.     Lantus® SoloSTAR® has been a commercially successful product.

38.     The Lantus® SoloSTAR® that Sanofi launched in the United States is depicted below:



### D. Infringement of the Asserted Device Patents ('044, '069, and '864 Patents)

**a.    The ▮▮▮▮▮▮▮▮ Meets the Disputed Claim Limitations of the '044 Patent**

39.    The prefilled insulin device containing Lilly's Proposed Insulin Glargine Product ▮▮▮▮▮▮▮▮ infringes claims 1, 5, 7, and 10 of U.S. Patent No. 8,603,044 ("the '044 Patent"). Claim 5 depends from claim 4, which depends from claim 1. Claims 7 and 10 also depend from claim 1.

**i.    ▮▮▮▮▮▮▮▮ has a "main housing" that "extend[s] from a distal end to a proximal end."**

40.    Claim 1 of the '044 Patent requires "a main housing, said main housing extending from a distal end to a proximal end." ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮



41.     We believe Lilly will concede that the ▮▮▮▮▮▮ housing extends from a distal end (the needle end of the device according to this patent) to a proximal end (the non-needle end of the device).

        **ii.     The ▮▮▮▮▮▮ has a "dose dial sleeve positioned within said housing,  said dose dial sleeve comprising a helical groove configured to engage a threading provided by said main housing, said helical groove provided along an outer surface of said dose dial sleeve."**

42.     Claim 1 of the '044 Patent further requires "a dose dial sleeve positioned within said housing, said dose dial sleeve comprising a helical groove configured to engage a threading provided by said main housing, said helical groove provided along an outer surface of said dose dial sleeve." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

43.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮



44.

45.

**iii.** ███████████████ **has a "a dose dial grip disposed near a proximal end of said dose dial sleeve."**

46.     Claim 1 of the '044 Patent requires "a dose dial grip disposed near a proximal end of said dose dial sleeve." ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████

47.     The Court construed "dose dial grip" as "[a] component that a user rotates to dial a dose."  *Markman* Order (D.E. 192) at 15.  We believe Lilly will concede ███████████

█████████████ is a component that a user rotates to dial a dose, and that the button is disposed near a proximal end of the dose dial sleeve.

**iv.** ███████████████ **has "a piston rod provided within said housing, said piston rod is non-rotatable during a dose setting step relative to said main housing."**

48.     Claim 1 of the '044 Patent requires "a piston rod provided within said housing, said piston rod is non-rotatable during a dose setting step relative to said main housing."  We believe Lilly will concede ███████████████████████████

████████████████████████████████████████████

██████████████████████████████



49.     The Court construed the phrase "said piston rod is non-rotatable during a dose setting step relative to said main housing" to mean "[a] piston rod that is prevented from rotating at the time when the dose is being set." *Markman* Order (D.E. 192) at 16.  We believe Lilly will concede that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

████████████████
    v.  ██████████████████████ **has "a drive sleeve extending along a portion of said piston rod, said drive sleeve comprising an internal threading near a distal portion of said drive sleeve, said internal threading adapted to engage an external thread of said piston rod."**

50.     Claim 1 of the '044 Patent requires "a drive sleeve extending along a portion of said piston rod, said drive sleeve comprising an internal threading near a distal portion of said drive sleeve, said internal threading adapted to engage an external thread of said piston rod."  We

believe Lilly will concede that ███████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████



51.    ██████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

52.    The Court construed "drive sleeve" to mean "[a]n essentially tubular component of essentially circular cross-section which is further releasably connected to the dose dial sleeve." *Markman* Order (D.E. 192) at 10.  The Court also construed the phrase "a drive sleeve releasably connected to the dose dial sleeve" in the context of U.S. Patent No. 8,556,864 ("'864 Patent") (one of the other asserted device patents) to mean "[a] drive sleeve that is reversibly joined to the dose dial sleeve, which allows coupling and decoupling."  *Markman* Order (D.E. 192) at 11.  We believe Lilly will concede ██████████████████████████████

███████████████████████

53.    The only requirement Lilly disputes is ████████████████████████████

████████████████████████████████████████████████████

████████████████

54. ███████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████



55. ████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████



56.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████

        **vi.**    ████████████████ **has "a tubular clutch located adjacent a distal end of said dose dial grip, said tubular clutch operatively coupled to said dose dial grip, wherein said dose dial sleeve extends circumferentially around at least a portion of said tubular clutch."**

57.   Claim 1 of the '044 Patent requires "a tubular clutch located adjacent a distal end of said dose dial grip, said tubular clutch operatively coupled to said dose dial grip, wherein said dose dial sleeve extends circumferentially around at least a portion of said tubular clutch." ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████



58.     The Court construed the term "tubular clutch" to mean "[a] clutch having the shape of a hollow cylindrical structure." *Markman* Order (D.E. 192) at 13.  The Court also construed the term "tubular clutch" as "[a] structure that couples and decouples a moveable component from another component." *Markman* Order (D.E. 192) at 12.  We believe Lilly will concede that (1) the clutch is located adjacent a distal end of the dose dial grip; (2) the clutch is operatively coupled to the dose dial grip; (3) the dose dial sleeve extends circumferentially around a portion of the clutch; and (4) the clutch couples and decouples a moveable component from another component.

59.     The only requirement Lilly disputes is whether the clutch is tubular.  During oral argument regarding claim construction, the parties "agreed that a 'tubular clutch' does not need to be 'continuous' or have 'circumferential ends.'" *Markman* Order (D.E. 192) at 13.  ████████ ████████████████ is in the shape of a hollow cylindrical structure.

60.     This is confirmed by U.S. Patent No. 7,291,132 ("'132 Patent"), which Lilly's witnesses confirmed describe ███████████████.  The '132 Patent states: "Nut 364 is made from injection molded plastic and includes a cylindrical, tube-shaped body 392, plunging rib 394 and a pair of torque fingers 396."  '132 Patent at 16:48-50.  ████████████████ ████████████████████████



Nut 364 from '132 Patent

61.    Like the nut of the '132 Patent, ████████████████████████████████

**vii.    ████████████████ has "a cartridge retaining part operatively coupled to said main housing, said cartridge retaining part comprising a fluid container."**

62.    Claim 1 of the '044 Patent requires "a cartridge retaining part operatively coupled to said main housing, said cartridge retaining part comprising a fluid container."  We believe Lilly will concede that the ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████

**viii.    The fluid container of the ████████████ "defines a medicament filled reservoir with a movable cartridge piston at a proximal end and an outlet at a distal end."**

63.    Claim 1 of the '044 Patent requires that the fluid container "define[] a medicament filled reservoir with a movable cartridge piston at a proximal end and an outlet at a distal end."  We believe Lilly will concede that this limitation is met by the ████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████

ix.    **The cartridge piston of the** ███████████ **is "movable by said piston rod to be advanced toward an outlet of said fluid container when said piston rod is moved distally."**

64.    Claim 1 of the '044 Patent requires that the cartridge piston of th██████ ████████ be "movable by said piston rod to be advanced toward an outlet of said fluid container when said piston rod is moved distally."  We believe Lilly will concede that during injection, the plunger (the cartridge piston) is advanced toward an outlet of cartridge as the piston rod advances toward the same direction.

65.    The only requirement Lilly disputes is whether the piston rod moves distally.  The Court did not construe the claim term a "cartridge piston movable by said piston rod to be advanced toward an outlet of said fluid container when said piston rod is moved distally."  Lilly's technical expert construes the term to require that the piston rod rotate as it is moved distally.  However, the Court stated that "[t]he '864 specification defines 'piston rod' . . . [and the] patentee's definition does not require the piston rod to be 'rotatable.'"  *Markman* Order (D.E. 192) at 16.  As such, the Court construed the term of claim 1 the '044 Patent, "said piston rod is non-rotatable during a dose setting step relative to said main housing," to mean "[a] piston rod that is prevented from rotating at the time when the dose is being set."  *Id.*  The Court rejected Lilly's proposed construction for that term of the '044 Patent that would require "said piston rod" to be rotatable.  *Id.*  Nonetheless, Lilly contends that it does not infringe claim 1 of the '044 Patent because the piston rod of ████████████████████████████ The claims do not require the piston rod "rotate" as it is "moved distally," ████████████ ████████████████ the element as required by claim 1 of the '044 Patent.

**x.      The ████████████ includes a "clicker" that provides "audible feedback to the user" when the "dose dial grip is rotated."**

66.      Claim 4 of the '044 Patent requires that the housing part for the medication dispensing apparatus include a "clicker, said clicker providing at least an audible feedback to a user when said dose dial grip is rotated."  Claim 5 requires that the clicker comprise "at least one flexible arm, said flexible arm comprising at least one tooth member, and at least one spline, wherein when said dose dial grip is rotated, said at least one flexible arm deforms and drags said tooth member over said at least one spline so as to provide said audible feedback." ████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

████████████████████████

67.      ██████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**xi.      The piston rod of the ████████████ includes "a first thread and a second thread, wherein at least one of said first or said**

**second thread comprises at least one part threads rather than a complete thread."**

68.     Claim 7 of the '044 Patent requires that the piston rod include "a first thread and a second thread, wherein at least one of said first or said second thread comprises at least one part threads rather than a complete thread." ███████████████████████

███████████████████

69.     The Court construed the term "thread" and "threading" to mean "[a] rib or groove on a first structure that engages a corresponding groove or rib on a second structure." *Markman Order* (D.E. 192) at 9-10.  We believe Lilly will concede that the piston rod includes a first thread, and that the first thread is a part thread rather than a complete thread.

70.     Lilly disputes, however, that the piston rod includes a second thread.  The Court accurately noted that "[t]he only point of dispute between the parties is whether the word 'helical' should be included before 'groove' in the construction," and rejected Lilly's proposed construction seeking to limit "thread" to a "helical" thread. ██████████████████

████████████████████████████

███████████████████████████████

███████████████████████████████

█████████

       **xii.     The dose dial sleeve of the** ████████████ **includes "a radial stop" at the end of the helical groove on its outer surface, which, when the maximum dose is reached, abuts the end of the internal thread of the housing to prevent further rotation of the dose dial sleeve.**

71.     Claim 10 of the '044 Patent requires that the dose dial sleeve include "at least one radial stop, said radial stop positioned near an end of said helical groove, wherein when said dose dial sleeve is rotated to set a maximum dose of said medication dispensing apparatus, said radial

stop near said end of said helical groove abuts an end of said threading provided on said inner

surface of said main housing and thereby prevents rotation of said dose dial sleeve."

72.     We believe Lilly will concede that the dose dial sleeve and housing components

of ███████████████ meet the requirements of claim 10 of the '044 Patent.  Specifically, we

believe that Lilly will admit that when maximum dose is reached, a radial stop located at the end

of the helical groove on the outer surface of the dose dial sleeve abuts the end of the internal

thread inside the housing, thus preventing further rotation of the dose dial sleeve.

**b.     ███████████████ Meets the Disputed Claim Limitations of the '069 Patent**

73.     ███████████████ infringes claim 1 of U.S. Patent No. 8,679,069 ("the '069

Patent").  Claim 1 of the '069 Patent is a subset of the elements of claim 1 of the '044 Patent.

Thus, ███████████████ infringes claim 1 of the '069 Patent for the same reasons it satisfies

claim 1 of the '044 Patent, as explained above.

74.     █████████████████████████████

███████████████████████████████████████

██████████████████████████████

█████████████████████████████████████

███████████████

**c.     ███████████████ Meets the Disputed Claim Limitations of the '864 Patent**

75.     ███████████████ infringes claim 2 of U.S. Patent No. 8,556,864.

**i.     ███████████████ has a "main housing" that "extend[s] from a distal end to a proximal end."**

76.     Claim 2 of the '864 Patent requires "a housing having a helical thread along an

inner surface."  We believe Lilly will concede that the ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

      **ii.**    ████████████████████ **has a "dose dial sleeve having a helical thread on an outer surface engaged with the helical thread of the housing."**

77.    Claim 2 of the '864 Patent requires "dose dial sleeve having a helical thread on an outer surface engaged with the helical thread of the housing." █████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

      **iii.**    ████████████████████ **has a "drive sleeve releasably connected to the dose dial sleeve."**

78.    Claim 2 of the '864 Patent requires "a drive sleeve releasably connected to the dose dial sleeve." For the same reasons discussed above in relation to the '044 Patent, █

███████████████████████████████████████████████████

███████████

      **iv.**    ████████████████████ **has "a clutch mechanism located between the dose dial sleeve and the drive sleeve."**

79.    Claim 2 of the '864 Patent requires "a clutch mechanism located between the dose dial sleeve and the drive sleeve." The Court construed the term "clutch mechanism" as "[a] structure that couples and decouples a moveable component from another component." *Markman* Order (D.E. 192) at 12. We believe Lilly will concede that the ████████████

██████████████████████████████████████████████████████

████████████████████████████████████

80.     Lilly only disputes that its clutch mechanism is "located between" the dose dial sleeve and the drive sleeve.  The Court did not construe the term "located between," but instead adopted the term's plain and ordinary meaning.  *Markman* Order (D.E. 192) at 13–14.

81.     ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

82.     According to Lilly, the clutch is not "located between" the drive sleeve and the dose dial sleeve in the above arrangement because the clutch is not located in the cylindrical space between the drive sleeve and the dose dial sleeve.  However, in its claim construction order, the Court explicitly stated that it "agree[d] with Sanofi that Lilly's 'in the cylindrical space' limitation is not supported by the intrinsic record. . . ."  *Markman* Order at 14.  Lilly's position is contrary to the Court's claim construction order.  In addition, Lilly's position is contrary to the plain and ordinary meaning of the phrase "located between" and is also contrary to the specifications of the asserted patents

          **v.**     **The ███████████████ clutch mechanism is configured such that "when the dose dial sleeve and the drive sleeve are**

**coupled, both are allowed to rotate with respect to the housing."**

83.     Claim 2 of the '864 Patent requires that the "clutch mechanism" be "configured such that" "when the dose dial sleeve and drive sleeve are coupled, both are allowed to rotate with respect to the housing." ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████

> vi.     ███████████████ **clutch mechanism is configured such that "when the dose dial sleeve and the drive sleeve are de-coupled, rotation of the dose dial sleeve with respect to the housing is allowed, while rotation of the drive sleeve with respect to the housing is prevented, whereby axial movement of the drive sleeve is allowed so that a force is transferred in a longitudinal direction to a proximal end of the drug delivery device."**

84.     Claim 2 of the '864 Patent requires that the "clutch mechanism" be "configured such that" "when the dose dial sleeve and the drive sleeve are de-coupled, rotation of the dose dial sleeve with respect to the housing is allowed, while rotation of the drive sleeve with respect to the housing is prevented."  We believe Lilly will ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████  We also believe that Lilly will concede that when the dose dial sleeve and drive sleeve are de-coupled, axial movement of the drive sleeve is allowed so that a force is transferred in a longitudinal direction to a proximal end (as used in the '864 Patent, refers to the needle end) of the drug delivery device.

85. ████████████████████████████████████████████

████████████████████████████████████████ The Court did not construe the term "the

clutch mechanism is configured such that . . . when the dose dial sleeve and the drive sleeve are

de-coupled . . . rotation of the drive sleeve with respect to the housing is prevented" but instead

adopted the term's plain and ordinary meaning. *Markman* Order (D.E. 192) at 14-15. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

86. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████

87. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

88. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████



89.



90. ████████████████████████████████████████████████

████████████████████████████████████████████

**E.    Validity of the Asserted Device Patents ('044, '069, and '864 Patents)**

91. █████████████████████████████████████████████████████████

██████████████████████

92.    A person of ordinary skill in the art for the Asserted Device Patents would be one who understands the structure of various drug injection delivery devices and understands the basics of device design and manufacturing.  That person would have a bachelor's degree in mechanical engineering or equivalent degree.

###### a.     Obviousness

93.     Lilly does not assert that any of the Asserted Devices Patents are invalid as anticipated under 35 U.S.C. § 102.

94.     Lilly contends that claims 1, 5, and 7 of the '044 Patent, claim 1 of the '069 Patent, and claim 2 of the '864 Patent are rendered obvious by U.S. Patent No. 6,004,297 ("*Steenfeldt-Jensen* '297 Patent") in view of U.S. Patent No. 7,241,278 ("*Møller*").  Lilly contends that claim 10 of the '044 Patent is obvious over the combination of the *Steenfeldt-Jensen* '297 Patent, *Møller*, and U.S. Patent No. 6,221,046 ("*Burroughs*").

###### i.     It is Undisputed That *Steenfeldt-Jensen* '297 Patent, *Møller*, and *Burroughs* Were Considered by the USPTO During Prosecution of the Asserted Device Patents

95.     It is undisputed that *Steenfeldt-Jensen* '297 Patent was cited to and considered by the USPTO during prosecution of the '864 Patent and other patents in the family of the '864 Patent, and that *Steenfeldt-Jensen* '297 Patent is listed on the cover of the '864 Patent.

96.     The following chart identifies each time *Steenfeldt-Jensen* '297 Patent, or a related patent having the same specification, was cited to and considered by the Examiner during the prosecution of the patents and applications in the family of the '864 Patent.

| Patent/Application | Date IDS Submitted | Reference(s) Identified | Date IDS Signed by Examiner |
|---|---|---|---|
| '864 Patent | 03/29/2011 | *Steenfeldt-Jensen* '297 Patent<br>*Steenfeldt-Jensen* '554 Patent[2]<br>*Steenfeldt-Jensen* '004 Patent[3] | 08/01/2013 |
|  | 08/13/2013 | *Steenfeldt-Jensen* '554 Patent | 08/28/2013 |
| '088 Patent[4] | 09/14/2006 | *Steenfeldt Jensen* '554 Patent | 01/18/2008 |

---

[2] *Steenfeldt Jensen* '554 Patent refers to International Patent Publication WO 99/38554 to Steenfeldt-Jensen, which has the same specification as *Steenfeldt-Jensen* '297 Patent.

[3] *Steenfeldt-Jensen* '004 Patent refers to U.S. Patent No. 6,235,004 to Steenfeldt-Jensen, which has the same specification as *Steenfeldt-Jensen* '297 Patent.

[4] The '864 Patent is a continuation of U.S. Patent No. 7,935,088 ("the '088 Patent").

| | 01/23/2008 | *Steenfeldt-Jensen* '297 Patent<br>*Steenfeldt Jensen* '554 Patent<br>*Steenfeldt-Jensen* '004 Patent | 10/17/2008 |
|---|---|---|---|
| '866 Application[5] | 09/03/2004 | *Steenfeldt Jensen* '554 Patent | 02/27/2006 |

97.     It is undisputed that *Steenfeldt-Jensen* '554 Patent, which has an identical specification to *Steenfeldt-Jensen* '297 Patent, was cited to and considered by the USPTO during prosecution of the '044 and '069 Patents and other patents in the same family, and that *Steenfeldt-Jensen* '554 Patent is listed on the cover of the both the '044 and '069 Patents.

98.     The following chart identifies each time *Steenfeldt-Jensen* '554 Patent, or a related patent having the same specification, was cited to and considered by the Examiner during the prosecution of the patents and applications in the family of the '044 and '069 Patents.

| Patent/Application | Date IDS Submitted | Reference(s) Identified | Date IDS Signed by Examiner |
|---|---|---|---|
| '044 Patent | 06/04/2013 | *Steenfeldt-Jensen* '554 Patent | 08/25/2013 |
| | 08/30/2013 | *Steenfeldt-Jensen* '554 Patent | 10/20/2013 |
| '069 Patent | 10/15/2012 | *Steenfeldt-Jensen* '554 Patent | 08/25/2013 |
| | 08/30/2013 | *Steenfeldt-Jensen* '554 Patent | 01/09/2014 |
| '833 Patent[6] | 07/11/2006 | *Steenfeldt-Jensen* '554 Patent | 08/10/2010 |
| '225 Application[7] | 09/27/2004 | *Steenfeldt-Jensen* '554 Patent | 01/09/2006 |

99.     It is undisputed that *Møller* was cited to and considered by the USPTO during prosecution of the '864 Patent and other patents in the family of the '864 Patent, and that *Møller* is listed on the cover of the '864 Patent.

100.     The following chart identifies each time Møller, or a related patent having the same specification, was cited to and considered by the Examiner during the prosecution of the patents and applications in the family of the '864 Patent.

---

[5] The '088 Patent is a continuation of U.S. Application No. 10/790,866 ("the '866 Application").
[6] The '069 Patent is a continuation of U.S. Patent No. 7,918,833 ("the '833 Patent").
[7] The '833 Patent is a continuation of U.S. Application No. 10/790,225 ("the '225 Application").

| Patent/Application | Date IDS Submitted | Reference(s) Identified | Date IDS Signed by Examiner |
|---|---|---|---|
| '864 Patent | 03/29/2011 | *Møller*<br>*Møller* '299[8]<br>*Møller* '578[9]<br>*Møller* '570[10]<br>*Møller* '602[11] | 08/01/2013 |
| | 08/13/2013 | *Møller*<br>*Møller* '299 | 08/28/2013 |
| '088 Patent | 09/14/2006 | *Møller* '570<br>*Møller* '602<br>*Møller* '299<br>*Møller* '578 | 01/18/2008 |
| '866 Application | 02/04/2005 | *Møller* '299 | 02/27/2006 |
| | 05/18/2005 | *Møller* '578 | 02/27/2006 |

101.    It is undisputed that *Møller*, and other patents related to *Møller* and having the same specification, were cited to and considered by the USPTO during prosecution of the '044 and '069 Patents and other patents in the same family, and that *Møller* is listed on the cover of both the '044 and '069 Patents.

102.    The following chart identifies each time *Møller*, or a related patent having the same specification, was cited to and considered by the Examiner during the prosecution of the patents and applications in the family of the '044 and '069 Patents.

| Patent/Application | Date IDS Submitted | Reference(s) Identified | Date IDS Signed by Examiner |
|---|---|---|---|
| '044 Patent | 06/04/2013 | *Møller* '578<br>*Møller* '299 | 08/25/2013 |
| | 08/30/2013 | *Møller* | 10/20/2013 |

---

[8]  *Møller* '299 refers to U.S. Patent Publication No. 2004/0059299, the U.S. publication of the application that issued as *Møller*.

[9]  *Møller* '578 refers to U.S. Patent Publication No. 2002/0052578, the U.S. publication of the parent application to *Møller*, which has the same specification as *Møller*.

[10]  *Møller* '570 refers to U.S. Patent Publication No. 2005/0209570, the U.S. publication of a continuation application of *Møller*, which has the same specification as *Møller*.

[11]  *Møller* '602 refers to U.S. Patent No. 6,663,602 to Møller, which is the parent application to *Møller*.

| '069 Patent | 01/20/2012 | *Møller '578* | 08/25/2013 |
| | 10/15/2012 | *Møller '299* | 08/25/2013 |
| | 08/30/2013 | *Møller* | 01/09/2014 |
| '833 Patent | 07/11/2006 | *Møller '299* | 08/10/2010 |
| | 08/21/2006 | *Møller '578* | 08/10/2010 |
| '225 Application | 01/19/2005 | *Møller '299* | 01/09/2006 |

103. Steenfeldt-Jensen '297 Patent (or a related patent having the same specification) and Møller (or a related patent having the same specification) were considered by the Examiner at the same time, having been cited in the same Information Disclosure Statement, during prosecution of each of the Asserted Device Patents.

104. It is undisputed that *Burroughs* was considered by the USPTO during prosecution of the '044 Patent, and other patents related to the '044 Patent, and that *Burroughs* is listed on the cover of the '044 Patent.

105. The following chart identifies each time *Burroughs* was cited to and considered by the Examiner during the prosecution of the patents and applications in the family of the '044 and '069 Patents.

| Patent/Application | Date IDS Submitted | Reference(s) Identified | Date IDS Signed by Examiner |
|---|---|---|---|
| '044 Patent | 06/04/2013 | *Burroughs* | 08/25/2013 |
| '069 Patent | 01/20/2012 | *Burroughs* | 08/25/2013 |
| '833 Patent | 08/21/2006 | *Burroughs* | 08/10/2010 |

### ii. A Person of Ordinary Skill in the Art Would Not Be Motivated to Combine *Steenfeldt-Jensen* '297 Patent and *Møller*

106. The combination of references proposed by Lilly represents impermissible hindsight bias. Lilly contends that one of ordinary skill in the art would incorporate the clutching system from *Møller* into *Steenfeldt*-Jensen. However, one of ordinary skill in the art

would not have been motivated to combine the teachings of *Steenfeldt-Jensen* with those of *Møller*, because they address different types of injection pens and teach away from one another.

107.    *Steenfeldt-Jensen* and *Møller* are fundamentally different mechanisms. *Steenfeldt-Jensen* describes a simple mechanism (having only 7 parts) that creates a mechanical advantage using helical threads, whereas *Møller* describes a relatively complicated device (more suitable for a reusable application) that creates a mechanical advantage through a gearbox.

108.    *Steenfeldt-Jensen* teaches away from the type of complex dosing mechanism used in *Møller*, explaining that "the number of parts from which the syringe is constructed and the number of different kinds of materials used in the syringe should be kept at a minimum." *Steenfeldt-Jensen* '297 Patent at 1:23-26. *Steenfeldt-Jensen* specifically criticizes the use of metal parts, which are used in *Møller*. *See id.* at 2:28-36.

109.    *Møller* specifically references and then criticizes *Steenfeldt-Jensen* (WO 99/38554) as causing excessive friction during injection due to its use of helical threads and lack of a gearbox. *See Møller* at 2:1-8. *Møller* teaches that "a traditional gearing using mutual engaging gear wheels and racks is preferred," unlike the type of gearing in *Steenfeldt-Jensen*. *See id.* at 2:7-8. *Møller* also teaches away from mechanisms that transform linear movement to rotational movement, as is done in *Steenfeldt-Jensen*. *Id.* at 2:43-49.

110.    In his Reply Expert Report, Lilly's expert, Dr. Jorge Ochoa, prepared an illustration (Figure 9, below) of an alleged combination of Steenfeldt-Jensen and Møller, which he characterized as "Steenfeldt-Jensen with a Møller Clutch." Lilly's other technical expert, Mr. Claus Møller, testified that all of the parts of the "Combined Device" of Figure 9, except the piston rod and unidirectional coupling, came from Møller. Only the piston rod and unidirectional coupling were from Steenfeldt-Jensen.



**Figure 9.** *Steenfeldt-Jensen* with a *Møller* Clutch.

111.    The "Combined Device" includes at least two features that are not disclosed or taught in either *Steenfeldt-Jensen* or *Møller*:  a clutch directly between the drive sleeve and dose dial sleeve and flanges on the drive sleeve to hold a spring.

112.    Contemporaneous documents produced by Sanofi (and its design firm, DCA), as well as produced by Lilly (and its design firm, IDEO) further demonstrate the lack of motivation to combine the *Steenfeldt-Jensen* and *Møller* references. ███████████████

████████████████████████████████████ ██████████

████████████████████████████████ The combination of *Steenfeldt-Jensen* and *Møller* would run contrary to each of these considerations.

113.    The combination of *Steenfeldt-Jensen* and *Møller* would increase the size of the device.  The combination would require additional radial layer in the drive mechanism.  It would also increase the overall length of the device by introducing a metal spring and ring of teeth.

114.    The combination of *Steenfeldt-Jensen* and *Møller* would decrease the reliability of the device.  The proposed combination would add additional moving parts, including parts that must mesh and unmesh during operation, complicating the device and its operation.

115.    The introduction of the clutch from *Møller* into *Steenfeldt-Jensen* complicates the simple dosing mechanism design described and depicted in *Steenfeldt-Jensen* by introducing additional, complicated parts and features.  *Steenfeldt-Jensen* also teaches away from a tight rotational coupling of the dose scale drum (17) and button extension or journal (33), which would occur if the clutch from *Møller* were added to *Steenfeldt-Jensen*.

116.    The combination of *Steenfeldt-Jensen* and *Møller* would also increase the cost of the device, such as by increasing the total number of parts and adding costly and complicated components, such as metal springs.

117.    It is undisputed that *Steenfeldt-Jensen* and *Møller* were assigned to Novo Nordisk A/S at the time the provisional application for *Møller* was filed, but Novo Nordisk A/S did not combine *Steenfeldt-Jensen* and *Møller*. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

118.    The combination of Steenfeldt-Jensen and Møller still fails to disclose several limitations of the asserted claims from the Asserted Device Patents.  Neither *Steenfeldt-Jensen* nor *Møller* teaches how to prevent rotation of the drive sleeve during injection, as required by claim 2 of the '864 Patent.  A person of ordinary skill in the art could not effectively combine *Steenfeldt-Jensen* and *Møller* to meet this limitation without impermissibly relying on hindsight. The combination of *Steenfeldt-Jensen* and *Møller* also does not have "at least one flexible arm, said flexible arm comprising at least one tooth member, and at least one spline," as required by claim 5 of the '044 Patent.

119.    The combination of *Steenfeldt-Jensen*, *Møller*, and *Burroughs* does not render obvious claim 10 of the '044 Patent.  Neither *Steenfeldt-Jensen*, *Møller*, nor *Burroughs* discloses a "radial stop positioned near an end of [a] helical groove" on the dose dial sleeve.

### iii.    The Commercial Success of Lantus® SoloSTAR® Further Demonstrates Non-Obviousness

120.    Lantus® SoloSTAR® has enjoyed immense commercial success with over $14 billion in U.S. sales since its launch in July 2007, including about $4.5 billion in 2014 alone.

121.    The dosing mechanism in the Lantus® SoloSTAR® pen practices the asserted claims of the '864, '044, and '069 Patents.  The patented dosing mechanism gives the SoloSTAR® device a unique set of benefits that make it easier for patients to use.  In particular, the patented mechanism makes the SoloSTAR® easier to dial and inject with a lower injection force, while simultaneously keeping the pen short with a low thumb reach and enabling a higher maximum dose.

122.    Studies conducted around the time the SoloSTAR® was launched demonstrate that patients prefer the SoloSTAR® to competing insulin pens because of the benefits provided by the patented dosing mechanism.

123.    The preference for SoloSTAR® gave Sanofi a competitive advantage that it used to substantially grow the Lantus® franchise.  When Sanofi launched Lantus® SoloSTAR® in 2007, it saw an immediate and dramatic acceleration of sales of Lantus® in a pen device.

124.    Sales of Lantus® SoloSTAR® quickly surpassed those of Lantus® OptiClik®, the prior generation of Lantus® pen that did not use the patented dosing mechanism claimed in the '864, '044, and '069 Patents.  Sales of Lantus® SoloSTAR® have also grown to rival and now exceed sales of Lantus® in a vial form.  This is true even though the same active ingredient, insulin glargine, is present is all of these Lantus® products.

125.     The total number of prescriptions sold of Lantus® SoloSTAR® also surpassed those of the previously best-selling insulin pen, Novolog FlexPen.  Lantus® SoloSTAR® has the highest market share of any insulin pen on the market.

126.     Accordingly, there is a nexus between sales of Lantus® SoloSTAR® and the patented dosing mechanism in the SoloSTAR® pen.  The fact that Sanofi was the first to invent such a commercially successful mechanism further demonstrates the non-obviousness of the '864, '044, and '069 Patents.

127.     In 2007, the Chicago Athenaeum Museum of Architecture and Design awarded SoloSTAR® its annual "Good Design Award."  This award is given to the most innovative and cutting-edge product designs produced around the world.

128.     In 2009, DCA was awarded the Gold, International Export, GRAND PRIX DBA Design Effectiveness Award for SoloSTAR® based, in part, on the patient satisfaction for and overall commercial success of the SoloSTAR®.  The GRAND PRIX award is presented to the product that demonstrates the most significant and impressive evidence of design effectiveness across all industries.

129.     In 2009, DCA was a finalist for the Prix Galien Award for the design of SoloSTAR®.  The Prix Galien award is one of the most prestigious honors in the medical device industry.  The award committee is made up of 11 distinguished individuals, including 7 Nobel Laureates, and honorees are judged, in part, on the innovative nature of the development.

### F.     Prosecution of the Device Patents

130.     Great Britain Application No. 0304822.0 was filed on March 3, 2003.

131.     U.S. Patent Application No. 10/790,225 ("the '225 application"), claiming priority to Great Britain Application No. 0304822.0, was filed in the United States on March 2, 2004.

132.     U.S. Patent Application No. 10/790,866 ("the '866 application"), also claiming priority to Great Britain Application No. 0304822.0, was filed in the United States on March 3, 2004.

### a.     '225 Application Family

133.     On July 11, 2006, Sanofi filed U.S. Patent Application No. 11/483,546 ("the '546 application") as a continuation application of the '225 application.  The '546 application issued as U.S. Patent No. 7,918,833 on April 5, 2011.

134.     U.S. Patent No. 7,918,833 received a Patent Term Adjustment of 1300 days under 35 U.S.C. § 154(b) due to delays admittedly caused by the Patent Office.

135.     On November 11, 2010, while the '546 application was pending, Sanofi filed U.S. Patent Application No. 12/944,544 ("the '544 application") as a continuation of the '546 application.

136.     The '544 application issued as the '069 Patent on March 25, 2014.

137.     The '069 Patent received a Patent Term Adjustment of 406 days under 35 U.S.C. § 154(b) due to delays admittedly caused by the Patent Office.

138.     On June 4, 2013, while the '544 application was pending, Sanofi filed U.S. Patent Application No. 13/909,649 ("the '649 application") as a continuation of the '544 application.

139.     The applicants filed a Request for Prioritized Examination for the '649 Application, which was granted on July 15, 2013.

140.     The '649 application issued as the '044 Patent on December 10, 2013.

### b.     '866 Application Family

141.     On September 14, 2006, Sanofi filed U.S. Patent Application No. 11/520,598 ("the '598 application") as a continuation of the '866 application.

142.     The '598 application issued as the U.S. Patent No. 7,935,088 on May 3, 2011.

143.     On March 30, 2011, while the '598 application was pending, Sanofi filed U.S. Patent Application No. 13/075,212 ("the '212 application") as a continuation of the '598 application.

144.     The '212 application issued as the '864 Patent on October 15, 2013.

145.     The '864 Patent received a Patent Term Adjustment of 301 days under 35 U.S.C. § 154(b) due to delays admittedly caused by the Patent Office.

### c.     Prioritized Examination

146.     Prioritized (Track I) Examination was first instituted briefly on April 4, 2011.  76 FR 18399-01.

147.     Prioritized (Track I) Examination was then suspended indefinitely on April 28, 2011.  76 FR 23876-01.

148.     Applicants were again permitted to request Prioritized (Track I) Examination as of December 19, 2011.  76 FR 78566-01.

149.     On June 4, 2013, as part of the initial filing of the '649 application, Sanofi filed a Request for Prioritized (Track 1) Examination, which was granted on July 15, 2013.


## II.     DISPUTED FACTS CONCERNING THE ASSERTED FORMULATION PATENTS

### A.     The Formulation Patents-In-Suit

150.     By assignment, Sanofi GmbH owns all right, title, and interest to each of the Formulation Patents-in-Suit.

151.     Sanofi U.S. is the exclusive licensee of the Formulation Patents-in-Suit with exclusive rights, including the rights to sell and offer to sell in the United States the technologies,

products, or services claimed by the Patents-in-Suit, further including the right to sue and recover for the infringement of the Patents-in-Suit.

### a.   The Asserted Formulation Patents ('652 and '930 Patents)

152.   The Asserted Formulation Patents are U.S. Patent Nos. 7,476,652 ("'652 Patent") and 7,713,930 ("'930 Patent")

153.   The Asserted Formulation Patents are directed to pharmaceutical formulations and not limited to a particular presentation of those formulations, such as a vial, cartridge, or ampoule.

### B.   New Drug Applications ("NDAS")

### a.   Sanofi's NDA

154.   We believe Lilly will concede that insulin glargine is the active pharmaceutical ingredient of Sanofi's Lantus® products, which are described in Sanofi NDA No. 21-081.

155.   Insulin glargine is an insulin analog with a chemical structure that differs from that of regular human insulin.

156.   Unlike regular human insulin, insulin glargine is soluble at low (acidic) pH, but exhibits reduced solubility at near-neutral pH.  When injected, insulin glargine forms small precipitates in the subcutaneous tissue.

157.   Insulin glargine's slow rate of dissolution into the bloodstream from the precipitates in the subcutaneous tissue provides patients who have taken insulin glargine with a long-acting therapeutic effect.

158.   The FDA approved the original Lantus® formulation in April 2000. Sanofi first sold Lantus® in the United States in May 2001.

159.   Sanofi's original formulation of Lantus® was sold in the United States in 10 mL vials.  The composition of the formulation was "100 IU (3.6378 mg) insulin glargine, 30 mcg

zinc, 2.7 mg m-cresol, 20 mg glycerol 85%, and water for injection," with pH to be adjusted by addition of aqueous solutions of hydrochloric acid and sodium hydroxide.[12]

160.    The Lantus® label instructed patients that the drug product should be clear, and that they should not inject any product that appeared cloudy.



164.    Sanofi filed provisional application No. 60/409,338, from which both the '652 and '930 Patents claim priority, on September 9, 2002.

165.    The FDA approved a modification to the Lantus® 10 mL vial presentation on March 15, 2005.  The reformulated product, which is significantly less likely to become turbid, includes polysorbate 20 as a stabilizer.

166.    On or about June 2006, Sanofi began selling 10 mL vials containing the reformulated Lantus® formulation in the United States.

167.    Sanofi has also sold Lantus® in 3 mL cartridges in the United States since at least 2005.

---

[12]   There are 1,000 micrograms ("mcg") in 1 milligram ("mg").

**b.      Lilly's NDA**

168.    In October, 2013, Lilly submitted NDA No. 205-692 to the FDA under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 355(b)(2) ("Lilly's NDA No. 205-692" or "Lilly's 505(b)(2) NDA"), seeking the FDA's approval to manufacture commercially and sell its proposed insulin glargine product ("Lilly's Proposed Insulin Glargine Product"), in a prefilled insulin delivery device.

169.    Lilly's NDA No. 205-692 relies in part on the safety and efficacy of Lantus®, as demonstrated in Sanofi NDA No. 21-081.

**i.      Lilly's Proposed Insulin Glargine Product**

170.    Lilly alternatively refers to Lilly's Proposed Insulin Glargine Product as "LY2963016" or as "Basaglar."

171.    ███████████████████████████████████████████

██████████████████████████████████████████████████

████       Lilly's NDA 206-609 was also filed under section 505(b)(2), and was the subject of a separate lawsuit before this Court, No. 14-cv-00884. ██████████████████████

████████████████████████

172.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

173. ████████████████████████████████

████████████████████████████████

██████

174. ████████████████████████████████

█████████████████████████████████

████████████████████████████████

175. ███████████████████████████████

██████████████████████████████████

█████████████████████████████████

176. ███████████████████████████████

███████████████████████████████

███████████████████████████

177. ███████████████████████████████

████████████████████████████████

█████████████████████████████████

██████████████████

178. ████████████████████████████████

████████████████████████████████

██████████████████████████████.

179. ████████████████████████████████

████████████████████████

[13] ████████████████████████████████
████████████████████████████████
██████

180. ███████████████████████████████████

███████████████████

181. █████████████████████████████████████

████████████████████████████

182. █████████████████████████████████████

████████████████████████████████████████

███

183. ██████████████████████████████████████████

██████████████████████████████████

██████████████

184. ██████████████████████████████████████

██████████████████████████████████████████

████

185. ████████████████████████████████████████

███████████

186. ████████████████████████████████████████

██████████

187. ████████████████████████████████████

███

188. ███████████████████████████████████████

███████████████████████████████████████████

████████████████

189. ████████████████████████████████████

████████████████████████████████████████

### C. Sanofi's Reformulated Lantus® Product Practices All Elements of the Asserted Claims

190. We believe Lilly will concede that since June 2006, Sanofi has sold a Lantus® formulation containing 20 ppm polysorbate 20 that is packaged in 10 mL vials for sale in the United States. (1 "ppm" is one "part per million")

191. We believe Lilly will concede that the formulation sold in the 10 mL vials of Lantus® since June 2006 practices claims 7, 10, 20, and 24 of the '652 Patent.

192. We believe Lilly will concede that the formulation sold in the 10 mL vials of Lantus® since June 2006 practices claims 7 and 17 of the '930 Patent.

### D. Infringement of the Asserted Formulation Patents ('652 and '930 Patents)

#### a. We believe Lilly will concede that Lilly's Proposed Insulin Glargine Product Meets Certain Claim Limitations of the '652 and '930 Patents

193. We believe Lilly will concede that the primary amino acid sequence of the insulin glargine in Lilly's Proposed Insulin Glargine Product is Gly(A21), Arg(B31), Arg(B32)-human insulin.

194. We believe Lilly will concede that the primary amino acid sequence of the insulin glargine in Lilly's Proposed Insulin Glargine Product is substantially the same as that of the insulin glargine in Lantus®.

195. We believe Lilly will concede that the concentration of insulin glargine in Lilly's Proposed Insulin Glargine Product will be 100 units of insulin glargine per mL.

196. We believe Lilly will concede that the concentration of insulin glargine in Lilly's Proposed Insulin Glargine Product will be substantially the same as the concentration of insulin glargine in the reformulated Lantus® product.



197.

198.

199.

200.

201.

202.

203.

204.

### i.     Lilly's Proposed Insulin Glargine Product Meets the Disputed Claim Limitations of the '652 and '930 Patents

205.     The filing by Lilly of its 205-692 505(b)(2) application, and the sale of Lilly's Proposed Insulin Glargine Product, infringes and will infringe claims 7, 10, 20, and 24 of the '652 Patent.  Claims 10 and 20 of the '652 Patent each depend from independent claim 1, among other intervening dependent claims.

206.    With respect to the '652 Patent, Lilly disputes only that Lilly's Proposed Insulin Glargine Product contains "polysorbate 20" (claim 10, depending from claim 2), "at least one chemical entity chosen from polysorbate 20 and polysorbate 80" (claim 20, depending from claim 1), and "at least one chemical entity chosen from polysorbate and poloxamers" (claims 7 and 24). ███████████████████████████████████████████

███████████████████████████████████

207.    The filing by Lilly of its 205-692 505(b)(2) application, and the sale of Lilly's Proposed Insulin Glargine Product, infringes and will infringe  claims 7 and 17 of U.S. Patent No. 7,713,930 ("the '930 Patent").  Claims 7 and 17 each depend from independent claim 1, among other intervening dependent claims.

208.    With respect to the '930 Patent, Lilly disputes only that Lilly's Proposed Insulin Glargine Product contains "at least one chemical entity chosen from esters and ethers of polyhydric alcohols" (claims 7and 7, depending from claim 1). ███████████████████

███████████████████████████████████████████

████████

209.    The Court adopted the plain and ordinary meaning of "at least one chemical entity chosen from."

210.    The Court construed the term "polysorbate" to mean "[p]artial fatty acid esters of sorbitol and its anhydrides copolymerized with approximately 20, 5, or 4 moles of ethylene oxide for each mole of sorbitol and its anhydrides."

211.    The Court construed the term "polysorbate 20" to mean "[a] laurate ester of sorbitol and its anhydrides copolymerized with approximately 20 moles of ethylene oxide for each mole of sorbitol and sorbitol anhydrides."

212.     The Court construed the term "polysorbate 80" to mean "[a]n oleate ester of sorbitol and its anhydrides copolymerized with approximately 20 moles of ethylene oxide for each mole of sorbitol and sorbitol anhydrides."

213.     █████████████████ in Lilly's Proposed Insulin Glargine Product meets "at least one chemical entity chosen from polysorbate and poloxamers" (claims 7 and 24) under the Court's constructions.

214.     █████████████████ in Lilly's Proposed Insulin Glargine Product meets the limitation "at least one chemical entity chosen from polysorbate and poloxamers" (claims 7 and 24) under the Court's constructions.

215.     █████████████████ in Lilly's Proposed Insulin Glargine Product meets the limitation "at least one chemical entity chosen from polysorbate and poloxamers" (claims 7 and 24) under the Court's constructions.

216.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

217.     ████████████████████████████████████████████████████████████████████████████████████████████████████████

218.     The Court construed the term "esters and ethers of polyhydric alcohols" to mean "[c]hemical compounds in which one or more of the hydroxyl groups of a polyhydric alcohol instead of being a hydroxyl group is an ester (RCOO-X) or ether (RC-O-X) group."

219.   ███████████████████████████████████████████

Proposed Insulin Glargine Product meets the limitation "at least one chemical entity chosen from esters and ethers of polyhydric alcohols" under the Court's construction

220.   Claims 7, 10, 20, and 24 of the '652 Patent and claims 7 and 17 of the '930 Patent do not contain any limitations on the minimum or maximum concentration of "polysorbate 20," "polysorbate 80," "polysorbates," or "esters and ethers of polyhydric alcohols."  Other claims, which are not asserted in this case, do contain such limitations.

221.   The asserted claims of the Asserted Formulation Patents do not contain any limitations concerning the functionality or effect of the claimed pharmaceutical formulation.  By contrast, Claim 8 of the '652 Patent, which is not asserted in this case, does contain such a limitation.

222.   ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

223.   ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

ii.   ████████████████████████████████████████
      ██████████████████████████████████████

224.   █████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████



231. ███████████████████████████████████

███████████████████████████████████████

███████

232. █████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

233. ████████████████████████████████

███████████████████████████████████

█████████████████

234. ██████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

235. ████████████████████████████████

██████████████████████████████████

███████

236. ████████████████████████████████

███████████████████████████████████████

████████████████████

              **iii.** █████████████████████

                         ██████████████████████

                         ██████████████████████

                         █████████████

237. ████████████████████████████████

███████████████████████████████████████

████████████████████





238.

239.

240.

241.

242.

243.

244.



███████████████████████████████████

███████████████████████

250.  ████████████████████████████████

█████████████████████

251.    Dr. Colin Nuckolls, a Chemistry Professor at Columbia University, worked with experienced scientists at Chemir, a reputable independent testing laboratory, to develop protocols and procedures to use for testing samples of Lilly's Proposed Insulin Glargine product for the presence of polysorbates.

252.    Dr. Nuckolls, in consultation with the scientists at Chemir, chose a technique known as Ultrahigh Performance Liquid Chromatography and Mass Spectrometry ("UPLC/MS") to analyze the samples for the presence of polysorbates.  UPLC/MS is a reliable and well-established technique for detecting and identifying specific chemical entities present at low levels in drug products.  It is a reliable and well-established technique for detecting and identifying polysorbates.  It combines the liquid chromatography technique UPLC, which separates the components of a sample, with MS, which provides analytical information about each component so separated.

253.    Chemir, under the direction and supervision of Dr. Nuckolls, used strict protocols and operating procedures in line with its reputation and expertise as an analytical lab with experience in UPLC/MS and the analysis of samples for the presence of polysorbates.

254.    Chemir, under the direction of Dr. Nuckolls, used an appropriate column (a C8 reverse phase column) and eluting solvent (a time-varied mixture of acetonitrile and aqueous ammonium acetate) for the effective separation of the components of the formulations to be tested.

255.    Lilly produced in discovery representative samples of Lilly's Proposed Insulin Glargine Product.  The representative samples were maintained in cold storage at all times during storage and shipment to Chemir.

256.    UPLC/MS was performed on polysorbate 20 and polysorbate 80 standards to generate chromatograms and mass spectra that could be compared to other chromatograms and mass spectra generated under identical conditions from representative samples of Lilly's Proposed Insulin Glargine Product.

257.    To ensure that any polysorbates present in Lilly's Proposed Insulin Glargine Product could be detected by the UPLC/MS instrumentation, Chemir concentrated the combined contents of seven 3 mL cartridges of Lilly's Proposed Insulin Glargine Product down to 1.5 mL by using a well-known and reliable laboratory procedure known as "lyophilization."

258.    The mass spectra of the components of the polysorbate samples separated by the UPLC contain a number of characteristic families of mass ion peaks.  One such family of peaks consists of peaks that are separated from each other by 22 mass-over-charge units; this family corresponds to polyoxyethylene sorbitans ("POES") are features of polysorbates and markers for the presence of polysorbate molecules.  Each POES molecule has approximately 20 polyoxyethylene units – the charge-to-mass ratio of the POES molecules in the family vary by 22 units to reflect the precise number of polyoxyethylene units that each specific molecule has.

259.    Under the analytical UPLC/MS conditions used at Chemir, the mass spectrum of the material eluting from the column at 2.81 minutes following injection of the polysorbate 20 standard contains a series of mass ion peaks separated by 22 mass-to-charge units.  Dr. Nuckolls determined that these mass ion peaks correspond to POES and serve as a fingerprint for polysorbate 20.

260.



261.

262.

263.



264.

265.

266.

267.



vi.

268.

269.

270.

271.

272. 

273.

E.    **Validity of the Asserted Formulation Patents ('652 and '930 Patents)**

274.    A person of ordinary skill in the art of pharmaceutical formulations to whom the '652 Patent and '930 Patent are directed would have an undergraduate or graduate degree in pharmaceutical or chemical sciences, with several years of industry or academic experience research and developing pharmaceutical formulations.  Such a person would have taken at least one class in organic chemistry and be familiar with the various organic chemistry functional groups. Such a person would also be familiar with substances that are used in pharmaceutical formulations, such as the polysorbates, polysorbate 20, and polysorbate 80.

a.    **Written Description**

275.    There is no evidence, let alone clear and convincing evidence, that the written descriptions of the '652 and '930 Patents would not convey with reasonable clarity to a person of ordinary skill in the art that the inventors were in possession of the new compositions of matter that constitute their claimed invention.

276.    The written descriptions of the '652 and '930 Patents disclose that the inventors sought to address the tendency of insulin glargine to aggregate when subjected to thermal and physio-mechanical stress.

277.    The written descriptions of the '652 and '930 Patents disclose that the inventors had possession of the use of surfactants, including "partial and fatty acid esters and ethers of polyhydric alcohols such as of glycerol, sorbitol and the like (Span®, Tween®, in particular Tween® 20 and Tween® 80, Myrj®, Brij®), Cremophor® or poloxamers," to address the aggregation problem.

278.    The written descriptions of the '652 and '930 Patents disclose several examples in which insulin glargine formulations were prepared containing concentrations of polysorbate 20 and polysorbate 80 ranging from 1 µg/ml to 30 µg/ml.  For such formulations, a concentration of 1 µg/ml equals approximately 1ppm (part per million).

279.    The original claims of the applications that became the '652 and '930 Patents, which are part of the written description of those patents, do not limit the concentration range of surfactants to be used in the claimed invention.

280.    Based on the written descriptions of the '652 and '930 Patents and his understanding of pharmaceutical formulations, a person of ordinary skill in the art would recognize that the named inventors were in possession of the claimed formulations, without any limitation on the concentrations of surfactants used therein.

281.    A person of ordinary skill would understand that non-ionic surfactants can be effective even at low concentrations.   Indeed, surfactant molecules tend to congregate and exert their effects at interfaces or surfaces—hence they are often referred to as "surface active agents." It is at these interfaces where the surfactant molecules will preferentially gather, and also where protein aggregation is most substantially delayed or prevented.

282.    A relatively small amount of a surfactant, forming a thin layer on the surface of a cartridge plunger, for example, could still inhibit protein aggregation that would otherwise result

from contact between the protein and the hydrophobic surface of the plunger, as the specifications of the asserted patents explain.

283.    Based on the written description of the '930 Patent, including the examples disclosing polysorbate 20 and polysorbate 80 and the disclosure of "glycerol, sorbitol and the like (Span®, Tween®, in particular Tween® 20 and Tween® 80, Myrj®, Brij®), Cremophor® or poloxamers," a person of ordinary skill in the art would understand that the inventor was in possession of the claimed genus of esters and ethers of polyhydric alcohols.

284.    The written description of the '930 Patent expressly describes the use of esters and ethers of polyhydric alcohols.  Based on this disclosure one of ordinary skill in the art can visualize and recognize the members of this genus.