# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| SANOFI-AVENTIS U.S. LLC and SANOFI-AVENTIS DEUTSCHLAND GMBH, | ) ) ) ) |
| Plaintiffs, | ) ) C.A. No. 14-113-RGA-MPT |
| v. | ) ) |
| ELI LILLY AND COMPANY, | ) ) |
| Defendant. | ) ) |

## PRE-TRIAL ORDER EXHIBIT 3
## ELI LILLY'S STATEMENT OF CONTESTED FACTS

# TABLE OF CONTENTS

**Page**

I.   The Asserted Formulation Patents ..................................................................... 1

    A.   Specifications of the Asserted Formulation Patents ............................... 1

    B.   Asserted Claims of the Formulation Patents............................................ 2

II.  Noninfringement of the Asserted Formulation Patents ..................................... 3

    A.   Sanofi's Vial and Cartridge Formulations .............................................. 3

    B.   Lilly's NDA Product Does Not Meet the "At Least One Chemical Entity"
of the Claimed Pharmaceutical Formulation Limitation ........................ 5

    C.   Sanofi Has Failed to Prove that Lilly's NDA Product is a Pharmaceutical
Formulation Comprising ██████████████████ .......................... 6

    D.   Sanofi Has Failed to Prove that the Lilly NDA Product is a Pharmaceutical
Formulation Comprising ████████████████████
████████████ ................................................................. 7

    E.   Sanofi Has Failed to Prove that Lilly's NDA Product is a Pharmaceutical
Formulation Comprising ████████████████████ ........... 9

    F.   Sanofi's Prior Allegations Regarding ████████████████
█████ from the Drug Substance........................................................ 9

    G.   ██████████████████████████████
████████████████████████
█████████████████ .............................................. 10

    H.   ██████████████████████████ ........ 11

III. The Asserted Device Patents .......................................................................... 14

    A.   Asserted Claims of the Device Patents .................................................. 14

IV.  Noninfringement of the Asserted Device Patents ........................................... 16

    A.   Sanofi Has Failed to Prove that Lilly's ████████ Uses A Drive
Sleeve That is Releasably Connected to a Dose Dial Sleeve............................. 16

    B.   Sanofi Has Failed to Prove that Lilly's ██████████ Uses A
"Tubular" Clutch........................................................................................ 16

███████████████

# TABLE OF CONTENTS
(continued)

Page

C.    Sanofi Has Failed to Prove that Lilly's ███████ Uses a Clutch Mechanism "Located Between" the Dose Dial Sleeve and the Drive Sleeve ........................................................................................ 17

V.   The Asserted Formulation Patents Are Invalid for Lack of Written Description............ 18

A.    The Specifications of the '652 and '930 Patents Do Not Support Claims So Broad as to Cover ████████████████ ██████████████ .................................................. 18

B.    The Specifications Do Not Support Claims Covering All "Esters and Ethers of Polyhydric Alcohols" ................................................ 19

VI.   The Asserted Device Patents Are Invalid for Obviousness ............................................... 20

A.    The Asserted Claims are Invalid in Light of the Prior Art, Including Steenfeldt-Jensen and Møller.............................................................. 20

B.    The Alleged Commercial Success of Lantus® Does Not Demonstrate Nonobviousness of the Asserted Claims of the Asserted Device Patents .......... 23

C.    Other Secondary Considerations........................................................ 26

VII.  The Asserted Device Patents Are Unenforceable Based on Prosecution Laches............. 27

Pursuant to Local Rule 16.3(c)(4), Defendant Eli Lilly and Company ("Lilly") submits the following statement of the issues of fact that remain to be litigated.  This statement is not exhaustive, and is based on Lilly's current understanding of the arguments Plaintiffs Sanofi-Aventis U.S. LLC and Sanofi-Aventis Deutschland GmbH (collectively, "Sanofi") are likely to make at trial, based on the pleadings, discovery, and expert reports to date.  To the extent Sanofi introduces different or additional facts or alleged facts in support of any claim or defense it asserts in this case, Lilly reserves the right to contest such facts or alleged facts, and to present any and all rebuttal evidence in response.

## I.      THE ASSERTED FORMULATION PATENTS

### A.      Specifications of the Asserted Formulation Patents

1.      It is undisputed that the specifications of the '652 and '930 patents describe the invention of the patents as being directed to "a pharmaceutical formulation".

2.      The specifications of the '652 and '930 patents describe the invention of the patents as being directed to "the addition" of non-ionic surfactants to "increase the stability" of acidic insulin preparations.

3.      The specifications of the '652 and '930 patents describe the concentration of surfactant present in the pharmaceutical composition to be 5-200 µg/mL.

4.      The specifications of the '652 and '930 patents do not describe ███████████ ██████ in the context of stabilizing protein or insulin formulations.

5.      The specifications of the '652 and '930 patents do not describe ██████ █████████████████ in the context of stabilizing protein or insulin formulations.

6.      The specifications of the '652 and '930 patents do not describe ██████ ███████████████ in the context of stabilizing protein or insulin formulations.

7.      The specifications of the '652 and '930 patents do not describe the use of surfactant concentrations below 5 µg/mL as stabilizing protein or insulin formulations.

8.      The specifications of the '652 and '930 patents do not describe surfactant concentrations below 1 µg/mL.

9.      The specifications of the '652 and '930 patents do not describe experimental results with any non-ionic surfactant besides polysorbate 20 and polysorbate 80.

**B.      Asserted Claims of the Formulation Patents**

10.      It is undisputed that the asserted claims of the '652 patent are all directed to a "pharmaceutical formulation" comprising insulin glargine and either: (1) "at least one chemical entity chosen from polysorbate 20 and polysorbate 80" or (2) "at least one chemical entity chosen from polysorbate and poloxamers," amongst other ingredients.

11.      It is undisputed that the asserted claims of the '930 patent are all directed to a "pharmaceutical formulation" comprising insulin glargine and "at least one chemical entity chosen from esters and ethers of polyhydric alcohols", amongst other ingredients.

12.      The asserted claims of the '652 and '930 patents all describe the addition of certain non-ionic surfactants to a pharmaceutical formulation.

13.      The specifications of the '652 and '930 patents do not support claims asserted to cover trace levels of polysorbates (including polysorbate 20 or 80), poloxamers, or esters or ethers of polyhydric alcohols alleged to be ███████████████████████████

14.      The specifications of the '652 and '930 patents do not contain language to support claims to trace levels of polysorbates (including polysorbate 20 or 80), poloxamers, or esters or ethers of polyhydric alcohols that do not provide a stabilizing effect.

15.     The specifications of the '652 and '930 patents do not contain language to support claims to the use of every compound that constitutes an ester or ether of a polyhydric alcohol in a pharmaceutical formulation of insulin glargine.

16.     The specifications of the '652 and '930 patents do not contain language to support claims to the use of every compound that constitutes an ester or ether of a polyhydric alcohol as a stabilizer for a pharmaceutical formulation of insulin glargine.

17.     A person of ordinary skill in the art would not consider ██████████ ████████████████████████████████████████████ ████████████████████

18.     A person of ordinary skill in the art would not consider the trace amount of a substance as asserted by Sanofi to be ███████████████████████████ ██████████ to be part of a pharmaceutical formulation.

19.     ████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████.

## II.     NONINFRINGEMENT OF THE ASSERTED FORMULATION PATENTS

**A.**     █████████████████████████████

20.     ████████████████████████████████████ ██████████████████████

21.     It is undisputed that Sanofi markets insulin glargine drug products under the trade name Lantus®, that Lantus® was approved by the FDA in April 2000, that Sanofi began selling Lantus® in the United States in May 2001.

22.     It is undisputed that the original Lantus® formulation was sold in 10 mL vials and consisted of "100 IU (3.6378 mg) insulin glargine, 30 mcg zinc, 2.7 mg m-cresol, 20 mg glycerol 85%, and water for injection," with pH to be adjusted by addition of aqueous solutions of hydrochloric acid and sodium hydroxide.

23.     ███████████████████████████████████████
████████████████████████████████████████████████████
████

24.     It is undisputed that Sanofi filed provisional application No. 60/409,338, from which both the '652 and '930 patents claim priority, on September 9, 2002.

25.     It is undisputed that Sanofi received FDA approval to modify the marketed Lantus 10 mL vial presentation to include polysorbate 20 as a stabilizer in on March 15, 2005.

26.     It is undisputed that Sanofi has also sold Lantus® in 3 mL cartridges since at least 2005.

27.     The cartridge version of Lantus® contains the formulation approved by the FDA in April 2000, which is the same formulation as the original Lantus® vials.  Neither polysorbate 20, nor any other non-ionic surfactant, is listed as an ingredient of the Lantus® cartridge formulation.

28.     ████████████████████████████████████
███████

29. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.

30. Sanofi has taken the position that its 3 mL cartridge form of Lantus is not covered by the '652 and '930 patents. It is undisputed that the '652 and '930 patents are not listed in the Orange Book for the 3 mL cartridge form of Lantus®.

**B.** **Lilly's NDA Product Does Not Meet the "At Least One Chemical Entity" of the Claimed Pharmaceutical Formulation Limitation**

31. Lilly submitted NDA No. 205-692 seeking FDA approval to market an insulin glargine formulation in 3 mL cartridges. Lilly's NDA defines the drug product that Lilly may sell after it receives FDA approval.

32. ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

33. The ingredients of Lilly's proposed product are listed in its NDA. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

34. ██████████████████████████████████████

████████████████████████████████████████████████

35.　████████████████████████████████████

████████████████████████████████████

**C.**　**Sanofi Has Failed to Prove that Lilly's NDA Product is a Pharmaceutical Formulation Comprising** ████████████████████

36.　It is undisputed that the ████████████████████████

████████████████████████████████

37.　It is undisputed that the ████████████████████████

████████████████████████████

38.　████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████

39.　████████████████████████████████

████████████████████████████████

████████████████████████████████

40.　████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████

41.　Sanofi alleges Lilly's NDA product contains ████████████████

████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

42.     Sanofi has also failed to show that ██████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

43.     ███████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████

44.     Literature indicates ██████████████████████████████████

███████████████████████████████████████████

45.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

**D.      Sanofi Has Failed to Prove that the Lilly NDA Product is a Pharmaceutical Formulation Comprising** ████████████████████████████
████████████████████

46.     ████████████████████████████████████████████████

████████████████████████████████████████████████

47. 

48.

49.

50.

51.

52.

53. Literature indicates that

54. Sanofi has failed to prove that

55.

56.

57.     Sanofi did not list the vial formulation patents in the Orange Book for Sanofi's Lantus cartridge product.

58.     Sanofi did not produce any testing of Lilly's NDA product with regard to its allegation of infringement based on ███████████

59.     ███████████████████████████████

███████████████

**E.      Sanofi Has Failed to Prove that Lilly's NDA Product is a Pharmaceutical Formulation Comprising the Claimed Substances Based** ███████████

60.     Sanofi alleges in the parties' joint pretrial order (Exhibit 2) that ███████████ ███████████████████████████████████

███████████████

61.     Sanofi has never identified in any of its discovery responses, infringement contentions, expert reports, or court filings any substance that it alleges constitutes infringement ███████████

62.     Sanofi does not identify ███████████████████ ███████████ in the parties' joint pretrial order.

**F.      Sanofi's Prior Allegations Regarding Introduction of** ███████████ **from the Drug Substance**

63.     In its infringement contentions and expert reports, Sanofi alleged that ███████████████████████████ within the scope of the '930 patent claims, and that this substance was present in Lilly's NDA product because it is an ███████████████████████████

███████████████████████████

64.     ███████████████████████████

███████████████████████████

65.     Sanofi's expert, Dr. Randolph, has taken the position that unless it is shown that

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████

66.     Dr. Randolph also testified that he could not opine as to whether all the

████████████████████████████████████████████████████████████

█████████ Sanofi did not produce documents to establish that it ████████████████████

█████ in accordance with Dr. Randolph's assertions.

67.     In the parties' joint pretrial order, Sanofi does not assert that Lilly's NDA Product

contains ██████████████████ or that this is a basis for an infringement contention.  To the

extent Sanofi contends that Lilly's NDA Product infringes because of the presence of

███████████████████████████████████████, the Asserted Claims of Sanofi's

'930 patent would be invalid as anticipated by Sanofi's own prior art Lantus formulation.

**G.**     █████████████████████████████████████
██████████████████████████

68.     ██████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████

69.     ███████████████████████████████████████
████████████████████████████████████████
████████████████████████

70.     ███████████████████████████████████████
███████████████████

71. 

72.

73.

74. Claimed substances were not identified

**H.** **Sanofi Has Not Proven Infringement by Its Reliance on**

75.

76.

77.

78. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

79. ████████████████████████████████████████

████████████████████████████████████

████████████████████████ Dr. Nuckolls reports that ████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████

80. ██████████████████████████████

████████████████████████

81. ██████████████████████████████

████████████████████████████████████████

██████████████████████



82. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

83. ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

84. ███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

85. Prior to ███████████████████████████████████

████████████████████████████████████████████

86. Dr. Nuckolls cannot demonstrate that the compound he asserts to be

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

87. ███████████████████████████████████████████

████████████████████████████████████████████

█████████████████

88. Sanofi asserts for the first time in the parties' pretrial order that Lilly's NDA product infringes the '930 patent based on the presence of ████████████████████████

Sanofi did not raise this theory of infringement in any of its previous discovery responses, infringement contentions, expert reports, or court filings. ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

89.     Sanofi has failed to show that Lilly is seeking approval to sell a product containing ████████████████████████████████████████
████████████████

90.     Sanofi has failed to show that Lilly's NDA product as approved will contain
████████████████████████████████████████████
██████

## III.    THE ASSERTED DEVICE PATENTS

### A.     Asserted Claims of the Device Patents

91.     Sanofi alleges Lilly's ████████████ infringes claims 1, 2, 4, 5, 6, 7, 8 and 10 of U.S. Patent No. 8,603,044 ("the '044 patent").  Claims 2, 4, 5, 6, 7, 8 and 10 of the '044 patent depend from claim 1 of the '044 patent either directly or through intervening dependent claims.

92.     Sanofi alleges Lilly's ████████████ infringes claim 1 of U.S. Patent No. 8,679,069 ("the '069 patent").  Claim 1 of the '069 patent is an independent claim.

93.     Sanofi alleges Lilly's ████████████ infringes claims 2 and 3 of U.S. Patent No. 8,556,864 ("the '864 Patent").  Claim 3 of the '864 patent depends from claim 2 of the '864 patent.

94.     The asserted claims of the '044 and '069 patents require, *inter alia*, a "housing part for a medication dispensing apparatus" that includes a "drive sleeve" threadedly connected with a piston rod and a "dose dial sleeve" threadedly connected to the housing, in which the dose

dial sleeve and the drive sleeve are "releasably connected." The '044 and '069 patent claims also require a "tubular clutch."

95.     The asserted claims of the '864 patent require, *inter alia*, a "drive mechanism for use in a drug delivery device" that includes a "drive sleeve" and a "dose dial sleeve" that is threadedly connected to the housing, in which the dose dial sleeve and the drive sleeve are "releasably connected." The '864 patent claims also require a "clutch mechanism located between the dose dial sleeve and the drive sleeve."

96.     The asserted patents describe the operation of the patented device in two phases: dose setting and injection.

97.     During dose setting and injection phases, the patented device uses a releasable connection between the drive sleeve and dose dial sleeve via a clutch located between the two sleeves.

98.     When setting a dose in the patented device, the user rotates the dose dial grip, which is attached to the dose dial sleeve. The dose dial sleeve and drive sleeve are connected to each other in this phase by the clutch sandwiched between the two sleeves. The dose dial sleeve and the drive sleeve rotate together during dose setting, with the dose dial sleeve climbing the thread of the housing and the drive sleeve climbing the thread of the piston rod at the same rate.

99.     When injecting a dose with the patented device, the user depresses the injection button, which disengages the clutch, and the drive sleeve and dose dial sleeve are thereby disconnected from each other.  With the drive sleeve and dose dial sleeve disconnected from each other, the dose dial sleeve rotates freely back into the housing during injection, while the drive sleeve is prevented from rotating and moves only axially, pushing the piston rod, which rotates forward to deliver the dose.

100.     Lilly's ███████████ does not infringe the asserted claims of the '044, '069,
or '864 patents because ███████████ does not contain at least the following limitations
(1) "a drive sleeve releasably connected to the dose dial sleeve," a (2) "tubular clutch," and (3) a
"clutch mechanism located between the dose dial sleeve and the drive sleeve."

## IV.     NONINFRINGEMENT OF THE ASSERTED DEVICE PATENTS

### A.     Sanofi Has Failed to Prove that Lilly's ███████████ Uses A Drive Sleeve That is Releasably Connected to a Dose Dial Sleeve

101.     ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

102.     It is undisputed that the Court construed the term "drive sleeve" to mean "[a]n
essentially tubular component of essentially circular cross-section which is further releasably
connected to the dose dial sleeve."  (*Markman* Opinion at 10.)

103.     It is undisputed that the Court construed the term "a drive sleeve releasably
connected to the dose dial sleeve" to mean "[a] drive sleeve that is reversibly joined to the dose
dial sleeve, which allows coupling and decoupling."  (*Markman* Opinion at 11-12.)

104.     It is undisputed that the patented device uses a releasable connection between the
drive sleeve and the dose dial sleeve.

105.     ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

### B.     Sanofi Has Failed to Prove that Lilly's ███████████ Uses A "Tubular" Clutch

106.     Sanofi has failed to show that the ███████████ has a tubular clutch as
claimed, as required by the asserted claims of the '044 and '069 patents.

107.    The Court has construed "tubular" in the term "tubular clutch" to mean "a clutch having the shape of a hollow cylindrical structure." (*Markman* Opinion at 13.)

108.    It is undisputed that the asserted patents describe the patented device as having a "clutch means 60 [that] is generally cylindrical . . . ."

109.    

110.    ███████████████████████████████████████

███████████████████████████████

**C.    Sanofi Has Failed to Prove that Lilly's ███████████ ® Uses a Clutch Mechanism "Located Between" the Dose Dial Sleeve and the Drive Sleeve**

111.    Sanofi has failed to show that the ███████████ uses a clutch mechanism located between ███████████, as required by the asserted claims of the '864 patent.

112.    The Court concluded that no construction was necessary for the term "located between" and that it would have its "plain and ordinary meaning." (*Markman* Opinion at 13-14.)

113.    With respect to Sanofi's proposed construction—"A clutch mechanism spatially positioned to engage with the dose dial sleeve and the drive sleeve"—the Court stated that Sanofi's "'spatially positioned' language is vague and unhelpful to construction" and it did not adopt Sanofi's proposed construction. (*Id.* at 14.)

114.    When describing the location of the clutch, the asserted '864 patent states that the clutch is located radially between the drive sleeve and the dose dial sleeve: "A clicker 50 and a clutch 60 are disposed about the drive sleeve 30, between the drive sleeve 30 and a dose dial sleeve 70 . . . ."

115.    The asserted '864 patent describes the clutch in the patented embodiment in relation to its physical location.

116. ███████████████████████████████████████████

███████████████████████

## V. THE ASSERTED FORMULATION PATENTS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION

### A. The Specifications of the '652 and '930 Patents Do Not Support Claims So Broad as to Cover the Trace Amounts of Compounds Asserted by Sanofi as Constituting Infringement

117.    A person of ordinary skill in the art with respect to the asserted claims of the '652 and '930 patents would have a Ph.D. in Chemistry, Chemical Engineering, Biochemistry, or a similar field, with a few years of experience in the development of pharmaceutical formulations, including protein formulations.

118.    The specifications of the '652 and '930 patents do not demonstrate to a person of ordinary skill in the art that Dr. Lill, ██████████████████████████████████████ ██████, or Dr. Brunner-Schwarz, was in possession of an alleged invention covering trace amounts of a compound that is alleged to be a component of a non-ionic surfactant in an insulin glargine formulation.

119.    The specifications of the '652 and '930 patents define the alleged invention as being the use of a non-ionic surfactant in an insulin formulation.  The specifications further disclose that the surfactant concentration range for the alleged invention is 5-200 µg/mL. Specifically, the specifications state, "The surfactants are present in a concentration of 5-200 µg/mL, preferably of 5-120 µg/mL and particularly preferably of 20-75 µg/mL".

120.    The lowest concentration discussed in the specifications of the '652 and '930 patents is the use of "Insulin glargine + 0.001 mg/mL of polysorbate 20" and "Insulin glargine + 0.001 mg/mL of polysorbate 80" in Example 3.  0.001 mg/mL is equivalent to 1 µg/mL.

121.     Example 3 in the specifications of the '652 and '930 patents does not contain any control.  It does not and cannot show that 0.001 mg/mL (1 µg/mL or 1 ppm) of polysorbate has any stabilizing effect on an insulin glargine formulation.

122.     

123.     The specifications of the '652 and '930 patents indicate the invention is the addition of non-ionic surfactants to stabilize insulin formulations.  The specification does not support claims so broad as to allegedly cover the trace amounts of substance which Sanofi contends constitutes infringement in this action.  Claims of such broad scope fail the requirement of adequate written description.

**B.     The Specifications Do Not Support Claims Covering All "Esters and Ethers of Polyhydric Alcohols"**

124.     The specifications of the '652 and '930 patents would not have demonstrated to a person of ordinary skill in the art that Dr. Lill, or Dr. Brunner-Schwarz ███████████████

125.     The specifications of the '652 and '930 patents do not describe the use of any non-ionic surfactant in stabilizing an insulin glargine formulation except for polysorbate 20 and polysorbate 80.

- 19 -

126.    Polysorbate 20 and polysorbate 80 are insufficient species to support Sanofi's broad claims to all "esters and ethers of polyhydric alcohols."

127.    

128.

129.    The alleged inventors could not even testify competently about the full scope of esters and ethers of polyhydric alcohol in the context of an insulin glargine formulation.

## VI.    THE ASSERTED DEVICE PATENTS ARE INVALID FOR OBVIOUSNESS

### A.    The Asserted Claims are Invalid in Light of the Prior Art, Including *Steenfeldt-Jensen* and *Møller*

130.    Sanofi did not invent injector pens or their components.  The prior art is crowded with injector pens.

131.    The operations of injector pen devices in the prior art involve mechanical components operating in a predictable fashion that function in expected ways.

132.    *Steenfeldt-Jensen* (U.S. Patent No. 6,004,297) discloses an injector pen that includes a dose dial sleeve and a drive sleeve.

133.    The *Steenfeldt-Jensen* dose dial sleeve surrounds at least a portion of hooks (34), and the upper portion of the injection button (dose dial grip) is disposed near a proximal end of the dose dial sleeve.  (*Steenfeldt-Jensen*, 7:52-57, Figs. 6-10.)

134.     *Steenfeldt-Jensen* discloses that, during dose dialing, the dose dial sleeve and drive sleeve rotate together along the thread of the housing and the thread of the piston rod, respectively.

135.     *Steenfeldt-Jensen* discloses that, during injection, the drive sleeve does not rotate but moves axially, and the dose dial sleeve rotates freely back to its original position.

136.     *Steenfeldt-Jensen* discloses that, during the dose dialing and injection phases, the drive sleeve and dose dial sleeve are rotationally coupled during dose dialing and rotationally uncoupled during dose injection.

137.     *Steenfeldt-Jensen* discloses that rotation of the injection button and drive sleeve is prevented during injection, with grooves (39) engaging with the clicker (protrusions (38)) inside the housing. (Id. at 8:13-30.)

138.     It is undisputed that Sanofi previously argued that *Steenfeldt-Jensen* discloses a clutch. (C.A. No. 07-306 (D.N.J.), D.I. 206 at 21 ("As shown in the claim charts, both embodiments of [*Steenfeldt-Jensen*] Figs. 6-10 and Figs. 11-13 disclose a device having a clutch, dose dial sleeve, and drive sleeve."))

139.     *Møller* (U.S. Patent No. 7,241,278) discloses a tubular clutch that couples a dose dial sleeve and a drive sleeve during dose setting, allowing the two to rotate together as the dose is set, and that decouples the dose dial sleeve from the drive sleeve during injection, allowing the dose dial sleeve to rotate freely back to the zero position, while the drive sleeve is prevented from rotating and moves only axially to advance the piston rod.

140.     *Møller*'s tubular clutch location in between the dose dial sleeve and drive sleeve accomplishes this coupling/uncoupling.

- 21 -

141.     *Møller* discloses that, during injection, the drive sleeve is prevented from rotating and can only move axially because there is no longer enough axial space for the ring (125) and teeth (124) to move down and pass the teeth on the clutch.

142.     The modification of *Steenfeldt-Jensen*'s clutching function to use the tubular clutch structure of *Møller* is an obvious design choice.  There are no differences between the combination of elements in the prior art and the subject matter of the Asserted Claims of the Asserted Device Patents.

143.     The concepts of mechanically linking the injection button and the piston rod for operation of the device, transforming linear motion of a drive sleeve during injection to push a piston rod to deliver a dose, and using a clutch component to either engage or disengage a coupling of components during dose dialing or injecting, were established in the art of injector pens and mechanical devices more generally.

144.     Novo's FlexPen was a dial-a-dose device, included a large, clear dose indicator window to help with accurate dose setting by the dose dial and allowed for dose correction by dialing forward and/or backward, had a dosing mechanism providing a mechanical advantage, and contained a clicker comprising flexible arms with tooth members and at least one spline.

145.     *Burroughs* incorporates "a clutching device for engaging and disengaging a generally cylindrical internally threaded nut" and a radial stop to prevent a user from dialing a too-high dose.

146.     It is undisputed that Sanofi previously admitted that there are a finite number of acceptable pen injector mechanisms in the crowded pen injector field.  (*Novo Nordisk A/S v. Sanofi Aventis U.S. LLC*, 07-cv-03206 (D.N.J. Feb. 4, 2008) (Novo Litigation, D.I. 206 at 3)

("Not only are there a limited number of acceptable mechanisms to link the injection button to the piston rod, but these limited options are already disclosed in numerous patents.")

147.    When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.

148.    One of ordinary skill in the art may find it obvious to combine pieces of prior art to gain the commonly understood benefits such as decreased size, increased reliability, simplified operation, and reduced cost.

149.    A person of ordinary skill in the art with respect to the asserted claims of the '864, '044, and '069 patents would have a bachelor's degree in Mechanical Engineering or equivalent and a minimum of four years' experience with design of injector pens or other mechanical/electro-mechanical drug delivery devices.

150.    A person of skill in the art would draw on prior art teachings that disclosed both disposable and reusable devices.

151.    From the perspective of one of skill in the art, improving the *Steenfeldt-Jensen* clutching function using a clutch shaped like that in *Møller* would be simple and predictable, and would readily be seen as working for its intended purpose.

**B.    The Alleged Commercial Success of Lantus® Does Not Demonstrate Nonobviousness of the Asserted Claims of the Asserted Device Patents**

152.    In 1997, Sanofi was granted U.S. Patent No. 5,656,722, which covers insulin glargine, pharmaceutical compositions thereof, and the treatment of diabetes.  Sanofi listed the '722 patent in the Orange Book as covering its Lantus® and Lantus® SoloSTAR® products.  The '722 patent expired in August 2014, and had pediatric exclusivity extending its regulatory exclusivity to February 2015.  The '722 patent granted Sanofi exclusive rights with respect to

insulin glargine formulations, including all the Lantus® products, from the time of their launch in May 2001 through expiration of the regulatory exclusivity in February 2015.



153.

154.

155.

156.

157.

158.

159.



160. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

161. ███████████████████████████████████████

███████████████████████████████████████

████████████

162. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

163. ███████████████████████████████████████

████████████████████████████

164. ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████

165.    Numerous other patents purporting to claim SoloSTAR® are listed in the Orange

Book for the Lantus SoloSTAR® Pen. ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

### C.      Other Secondary Considerations

166.    Sanofi has failed to produce evidence demonstrating other secondary considerations supporting alleged nonobviousness of the Asserted Claims of the Asserted Device Patents.  Further, any such evidence would be insufficient to overcome the obviousness of the subject matter recited in the Asserted Claims in view of the prior art.

167.    ███████████████████████████████████████████

███████████████████████████████████████████████

168.    Pen injectors are required to meet dose accuracy standards set by the International Organization for Standardization.

169.    Many prior art insulin pens had low manufacturing costs or required few parts.

170.    ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

171.    Sanofi alleges that the clutch of the asserted claims enhances user experience by allowing a user to "dial a dose up or down without dispensing (*i.e.*, wasting insulin)" and "dial the next dose without additional steps."

172.    Multiple prior art devices, including Lilly's Ergo® pen and Novo Nordisk's FlexPen®, allowed a user to "dial a dose up or down without dispensing (*i.e.*, wasting insulin)" and "dial the next dose without additional steps."

173.    Sanofi has failed to produce evidence that any industry acclaim or awards given to SoloSTAR® are driven by specific features of the Asserted Claims of the Asserted Device Patents.

## VII.   THE ASSERTED DEVICE PATENTS ARE UNENFORCEABLE BASED ON PROSECUTION LACHES

174.   The first patent application leading to the '864, '044, and '069 patents was filed in Great Britain on March 3, 2003.

175.   U.S. Patent Application No. 10/790,225 ("the '225 application") claiming priority to the Great Britain application was filed in the United States on March 2, 2004 with claims directed to a dose dial sleeve and drive sleeve having the same leads.

176.   On January 11, 2006, the Patent Office rejected the 14 pending claims in the '225 application as anticipated by one prior art reference.

177.   DCA did not substantively respond to the January 11, 2006 office action, and, on August 4, 2006, the '225 application was abandoned.

178.   Instead of prosecuting the '225 application, DCA filed a continuation application on July 11, 2006, resubmitting the original specification and claims of the '225 application as U.S. Patent Application No. 11/483,546 ("the '546 application").

179.   The '546 application resulted in the issuance of U.S. Patent No. 7,918,833 directed to a pen type injector "characterised [sic] in that the first lead of the helical thread and the second lead of the helical groove are the same."

180.   By re-filing the '546 application, instead of prosecuting the '225 application, prosecution of the subject matter contained in those identical applications was delayed.

181.   In a parallel prosecution, DCA also filed U.S. Application No. 10/790,866 ("the '866 application") on March 3, 2004.

182.   Similar to the '225 prosecution, DCA abandoned the '866 application and filed U.S. Application No. 11/520,598 ("the '598 application") on September 14, 2006, thereby delaying prosecution of the subject matter in those applications as well.

- 27 -

183.     Four years after filing the '546 application, on November 11, 2010, DCA then filed another continuation application, again resubmitting the original specification and claims of the '546 application as U.S. Patent Application No. 12/944,544 ("the '544 application"). ('544 application at 1-22.)

184.     On the day that the '544 application was filed, however, DCA cancelled claims 1-14 and submitted new claims 15-75, dropping the  dose dial sleeve and drive sleeve having the "same leads" limitation. ('544 application, Preliminary Amendment at 3-15 (Nov. 11, 2010).)

185.     The Patent Office issued a Notice of Allowance to the '544 application on January 16, 2014. ('544 application, Notice of Allowance at 1-3 (Jan. 16, 2014).)

186.     The application leading to the '044 patent, U.S. Patent Application No. 13/909,649 ("the '649 application"), was filed on June 4, 2013 as a continuation of the '544 application discussed above.

187.     DCA subsequently filed a Request for Prioritized Examination for the '649 Application, which was granted on July 15, 2013.

188.     The Patent Office issued a Notice of Allowance on October 24, 2013, only five months after filing the application. ('649 application, Notice of Allowance at 1-3 (Oct. 24, 2013).)  No reasonable explanation was given for why DCA delayed years before requesting expedited prosecution.

189.     In February of 2008, Eli Lilly launched KwikPen® in the United States.

190.     ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

191.     After remaining dormant for years, between January 2009 and March 2011, and after the launch of KwikPen®, DCA filed six new applications claiming priority to either the '225 or '866 application.

192.     In subsequent years, Sanofi continued expanding its patent prosecutions and filing more patent applications.  In 2013, Sanofi filed three more new applications based on the same foreign priority applications.

193.     In 2014 and 2015, Sanofi filed an additional eight applications based on the same foreign priority applications.

194.     There have been at least eleven continuation applications that have been filed by Sanofi over a nine-year period of time from the date of the original U.S. priority applications on which all of Sanofi's asserted pen patents are based.

195.     During prosecution of its patents, Sanofi adopted the prosecution strategy of, after receiving a rejection of its claims, abandoning the previous application in favor of a continuation having the same claims, resulting in extended delays.

196.     As apparent from the '649 application, Sanofi knew how to expedite prosecution but chose not to do so until 2013.

197.     Sanofi acted with unreasonable and unexplained delay in seeking issuance of the patent claims that are now being asserted against the Lilly's ██████████ device.